# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2697-17T2
      A-2698-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

  Plaintiff-Respondent,

v.

S.C. and G.S.,

  Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF S.J.S,

  a Minor.

_____

    Argued May 2, 2019 – Decided June 3, 2019

    Before Judges Simonelli, Whipple and Firko.

    On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0021-17.

Lauren Derasmo, Designated Counsel, argued the cause for appellant S.C. (Joseph E. Krakora, Public Defender, attorney; Lauren Derasmo, on the briefs).

Marc D. Pereira, Designated Counsel, argued the cause for appellant G.S. (Joseph E. Krakora, Public Defender, attorney; Marc D. Pereira, on the briefs).

Julie Beth Colonna, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason Wade Rockwell, Assistant Attorney General, of counsel; Julie Beth Colonna, on the brief).

Olivia Belfatto Crisp, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Olivia Belfatto Crisp, on the brief).

PER CURIAM

Defendant S.C. (Sandra),[1] the biological mother of S.J.S. (Sam), born in March 2016, and G.S. (George), the biological father, appeal from the February 2, 2018 judgment of guardianship, which terminated their parental rights to the child. Sandra challenges the trial judge's finding that plaintiff Division of Child Protection & Permanency (Division) proved prongs two, three, and four of N.J.S.A. 30:4C-15.1(a). George challenges the judge's findings on all four prongs. George also argues he was deprived of due process and fundamental

---

[1] We used pseudonyms to identify defendants and the child. R. 1:38-3(d)(12). We shall sometimes collectively refer to Sandra and George as defendants.

fairness when the Division presented a different theory for termination than asserted in the guardianship complaint, and the Division erred in failing to properly determine whether Sam was a Native American child under the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963 (ICWA). We affirm.

We will not recite in detail the history of the Division's involvement with the family. Instead, we incorporate by reference the factual findings set forth in Judge Vicki A. Citrino's comprehensive written opinion, dated February 2, 2018. We add the following comments.

A court should terminate parental rights when the Division shows by clear and convincing evidence that:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

3

(4)     Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

These "four prongs are not 'discrete and separate', but 'relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests.'" N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 606-07 (2007)).

The Division need not demonstrate actual harm in order to satisfy prong one. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001). "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of DMH, 161 N.J. 365, 383 (1999). The test is whether the child's safety, health or development will be endangered in the future and whether the parent is or will be able to eliminate the harm. A.G., 344 N.J. Super. at 440. Prong one can be satisfied by establishing the serious psychological damage to the child caused by the parental relationship, as well as the potential for emotional or psychological harm resulting from the parent's actions or inactions. In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). Also, a parent's failure to provide a

A-2697-17T2

"permanent, safe and stable home" engenders significant harm to the child. DMH, 161 N.J. at 383.

The first prong of the best interests test requires the Division to show that "the alleged harm 'threatens the child's health and will likely have continuing deleterious effects on the child.'" F.M., 211 N.J. at 449 (quoting In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999)). "To satisfy this prong, [the Division] does not have to wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" Ibid. (quoting DMH, 161 N.J. at 383).

A parent's failure to provide a "permanent, safe and stable home" engenders significant harm to the child. DMH, 161 N.J. at 383. Likewise, a parent's failure to provide "solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379. Compounding the harm is the parent's "persistent failure to perform any parenting functions and to provide . . . support for [the child.]" Id. at 380. Such inaction "constitutes a parental harm to that child arising out of the parental relationship [that is] cognizable under N.J.S.A. 30:4C-15.1(a)(1) and (2)." Id. at 380-81.

"The second prong, in many ways, addresses considerations touched on in prong one." F.M., 211 N.J. at 451. The focus is on parental unfitness. K.H.O.,

A-2697-17T2

161 N.J. at 352; <u>DMH</u>, 161 N.J. at 378-79.  In considering this prong, the court should determine whether it is reasonably foreseeable that the parent can cease to inflict harm upon the child.  <u>A.W.</u>, 103 N.J. 591, 607 (1986).  The second prong may be satisfied

> by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care, and the diversion of family resources in order to support a drug habit, with the resultant neglect and lack of nurture for the child.
>
> [<u>K.H.O.</u>, 161 N.J. at 353.]

"Prong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with foster parents.'"  <u>F.M.</u>, 211 N.J. at 451 (alteration in original) (quoting <u>K.H.O.</u>, 161 N.J. at 363).

"The third prong requires an evaluation of whether [the Division] 'made reasonable efforts to provide services to help the parent' remedy the circumstances that led to removal of the children from the home."  <u>Id.</u> at 452 (quoting N.J.S.A. 30:4C-15.1(a)(3)).  The emphasis on the third prong

> is on the steps taken by [the Division] toward the goal of reunification.  "The diligence of [the Division's] efforts on behalf of a parent is not measured by" whether those efforts were successful.  "'Reasonable

efforts' may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." Experience tells us that even [the Division's] best efforts may not be sufficient to salvage a parental relationship.

[Ibid. (first quoting DMH, 161 N.J. at 393; then quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007)).]

As part of the inquiry, "the court must consider the alternatives to termination of parental rights and whether the Division acted reasonably." A.G., 344 N.J. Super. at 434-35. "The reasonableness of the Division's efforts depends on the facts in each case." Id. at 435.

The fourth prong seeks to determine whether "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The fourth prong serves as a "'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453. "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108 (2008). The court must determine "whether . . . the child will suffer a greater harm from the termination of ties with [his or] her natural

parents than from the permanent disruption of [his or] her relationship with [his or] her foster parents." K.H.O., 161 N.J. at 355.

Because harm to the child stemming from termination of parental rights is inevitable, "the fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid. Rather, the court's inquiry is one of comparative harm, for which the court must consider expert evaluations of the strength of the child's relationship to the biological parents and the foster parents. Ibid. Thus, "'[t]o satisfy the fourth prong, the [Division] should offer testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents.'" F.M., 211 N.J. at 453 (quoting M.M. 189 N.J. at 281). "Under this prong, an important consideration is [a] child's need for permanency. Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." Ibid. (alteration in original) (quoting M.M., 189 N.J. at 281).

Judge Citrino reviewed the evidence presented at the trial, made meticulous factual findings as to each prong of N.J.S.A. 30:4C-15.1(a), and

thereafter concluded the Division met by clear and convincing evidence all of the legal requirements for a judgment of guardianship as to both defendants. The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a), accords with N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420 (2012), N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88 (2008), In re Guardianship of K.H.O., 161 N.J. 337 (1999), In re Guardianship of DMH, 161 N.J. 365 (1999), and N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591 (1986), and is amply supported by the record. We affirm substantially for the reasons Judge Citrino expressed in her cogent written opinion. However, we make the following brief comments.

Contrary to Sandra's contention, there was no actual evidence that the Division contacted or conspired with U.S. Immigration and Customs Enforcement (ICE) to have her arrested and/or deported. She misrepresents the significance of the contact sheets on which she relies to argue the contrary. For example, she argues that the September 27, 2016, contact sheet "demonstrates that [the Division] was specifically requesting that ICE detain [her] while [the ICE] Agent . . . basically apologized to [the Division] that he had not had the time to apprehend her." However, the contact sheet shows that the Division worker emailed the ICE agent as follows: "Just wondering what is the status of

this. [Sandra] has reached out to us telephonically, but not provided a current address and as such we are initiating a search. Do you have any information regarding her current whereabouts that could assist us?" To which the ICE agent responded: "I was transferred to a different unit. I am still her investigator. I have not had a chance to do anything. Hopefully I will work it in October."

Sandra also points to the February 7, 2017, contact sheet to support her contention that the Division disclosed confidential information to ICE. The contact sheet indicated: "[Sandra] confirmed her address but not apartment number. ICE is looking for her and contacted [the Division]. They were provided her current address and reported they may come to the court hearing to detain her." However, that entry does not specifically state that the Division provided ICE with Sandra's address; it is ambiguous at best.

There is no merit in George's contention that he was deprived of due process and fundamental fairness because the Division alleged he harmed Sam under a theory of abandonment, as reflected in the guardianship complaint, but proceeded at trial under a different theory. The guardianship complaint advised George that the Division intended to satisfy the four prongs of the best-interests-of-the-child standard under N.J.S.A. 30:4C-15.1(a) and did not intend to pursue an abandonment theory.

A-2697-17T2

There also is no merit in George's contention that the Division erred in failing to properly determine whether Sam was a Native American child under the ICWA by failing to comply with the statute's notice requirements. George testified that he has Native American heritage:

> My, my mother is 100 percent Native American. She's half Cherokee and half Lenape Indian. My grandmother is . . . from the Ramapough Lenape Nation, which . . . half of the reservation sits in Mahwah, New Jersey and the other half sits on the Suffern, New York side. My grandfather comes from the Cree Cherokee Nation, Oklahoma City, Oklahoma.

Judge Citrino found as follows:

> [George] had previously indicated that he had Ramapough Lenape heritage . . . but testified at trial for the first time that his mother was "one-hundred percent Native American"—he described her as "half Lenape Indian" and "half Cherokee." [George]'s testimony differs slightly from the certification produced by his attorney on the same subject. [George]'s attorney's certification states that [George]'s mother was "half Lenape Ramapo" through her mother (his maternal grandmother) and "half Cree Cherokee" through her father (his maternal grandfather). While the testimony and the certification may seem the same, the inconsistency between "Cree Cherokee" and "Cherokee" is material. There are a number of different Cherokee tribes, some of which are federally recognized and some of which of which are not. There is only a single federally recognized Cree tribe—the Chippewa Cree in Montana—which is not affiliated with the Cherokee, despite [George]'s attorney's certification. See 81 F.R. 5019 (Jan. 29, 2016); . . .

11

[George] later indicated that his maternal grandfather is "Cree Cherokee" from Oklahoma City, Oklahoma . . . . After the Court ordered [George]'s counsel to comply with the Division's request to provide enough information to the Division for it to provide appropriate ICWA notices, the Division sent letters to the Cherokee Nation of Oklahoma, the United Keetoowah Band of Cherokee Indians, the Eastern Band of Cherokee Indians, and the Chippewa-Cree Indians of the Rocky Boy's Reservation. The Ramapough Lenape tribe is not federally recognized; as a result, ICWA would not apply even if [Sam] does have Ramapough Lenape heritage. See 81 F.R. 5019 (Jan. 29, 2016). That the State of New Jersey recognizes the tribe is not relevant; ICWA applies only to federally recognized tribes.

Judge Citrino added:

Should any of the federally recognized Indian tribes noticed . . . notify the Division that it recognizes [Sam] as an "Indian Child" as defined under ICWA within the time ICWA prescribes, such tribe shall be permitted to request that the matter be reopened. The Court notes, however, that it would have made the same findings under the heightened standard required under ICWA, which requires evidentiary support beyond a reasonable doubt, including testimony from a qualified expert, that "continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1913(f). The same evidence, particularly the lasting negative psychological impact on [Sam] if he were to be removed from his current resource parents and [George's] inability to remedy that impact about which Dr. Kanen testified, supports the same finding under ICWA.

In order to preserve the "continued existence and integrity of Indian tribes[,]" In re Adoption of a Child of Indian Heritage, 111 N.J. 155, 166 (1988), "tribes have the right to intervene" in a court proceeding involving termination of parental rights. N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 369 (App. Div. 2015). To facilitate exercise of the right, the ICWA requires notice. Ibid. (discussing 25 U.S.C. § 1912(a)). The obligation to give notice is triggered when "a state court knows or has reason to know that the child involved is an 'Indian child[.]'" Ibid. A child is an "Indian child" when the child is either: "(a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. § 1903(4). "Tribes have different criteria" to determine who can be a member and have "exclusive authority" over that determination. K.T.D., 439 N.J. Super. at 369-70.

Under federal regulations, the Division, as the "party seeking" termination, was obligated, if known, to "directly notify the parents . . . and the child's Tribe by certified mail with return receipt requested, of the pending child-custody proceedings and of their right of intervention." 25 C.F.R. § 23.11(a). The Bureau of Indian Affairs (BIA) "has issued guidelines to assist in interpreting the ICWA." K.T.D., 439 N.J. Super. at 371. Per the Guidelines,

"[i]f there is any reason to believe the child is an Indian child, the agency and State court must treat the child as an Indian child, unless and until it is determined that the child is not a member or is not eligible for membership in an Indian tribe."  Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146, 10,152 (Feb. 25, 2015).  The court is to confirm that the Division made "active efforts" to work with the tribes to verify if the child may be eligible for membership.  Ibid.  The Guidelines define "active efforts" as beyond "reasonable efforts."  Id. at 10,150.  Once a child is determined to be an Indian child, proof beyond a reasonable doubt is required.  K.T.D., 439 N.J. Super. at 370 (citing 25 U.S.C. § 1912(f)).

Here, as Judge Citrino explained, George initially said he had Ramapough Lenape heritage and the Division determined the Ramapough Lenape is not a federally recognized tribe.  See 83 Fed. Reg. 4235 (Jan. 30, 2018).  However, the Division provided notice of George's and Sam's possible Native American heritage to the Delaware Tribe of Indian Lenape.  By letter dated November 20, 2017, the Delaware Tribe of Indians confirmed that George and Sam were not enrolled, registered members, or eligible for enrollment.

At trial, George claimed he was of Lenape and Cherokee Indian heritage and the Division immediately notified several federally recognized tribes and

14

the BIA of Sam's possible Cherokee and/or Lenape heritage. All tribes noticed confirmed that Sam is not an "Indian Child" within the meaning of the ICWA, and therefore, the tribes have no basis to intervene or seek jurisdiction in his case. See U.S.C. 23 § 1911(b) and (c).

Furthermore, George does not actually argue that Sam is an "Indian Child" within the meaning of the ICWA, and there is no evidence the child is an Indian child. Thus, the evidence supports Judge Citrino's conclusion that the ICWA does not apply to Sam.

Finally, the record also supports Judge Citrino's conclusion that she "would have made the same findings under the heightened standard required under ICWA, which requires evidentiary support beyond a reasonable doubt." Thus, even if the ICWA did apply to Sam, the judge did not err by terminating defendants' parental rights to the child.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2697-17T2