**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2329-19
A-3679-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.R. and R.D.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.D.,
a minor.

_____

     Argued March 16, 2021 – Decided April 5, 2021

     Before Judges Haas, Mawla, and Natali.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0037-19.

     Stephania Saienni-Albert, Designated Counsel, argued the cause for appellant S.R. (Joseph E. Krakora, Public

Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Stephania Saienni-Albert, on the briefs).

Anne E. Gowen, Designated Counsel, argued the cause for appellant R.D. (Joseph E. Krakora, Public Defender, attorney; Anne E. Gowen, on the briefs).

Amy Melissa Young, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, on the brief).

Noel C. Devlin, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, on the brief).

PER CURIAM

In these consolidated appeals, S.R. and R.D.,[1] parents of A.D., challenge the Family Part's January 24, 2020 orders terminating their parental rights. The Law Guardian and the Division of Child Protection and Permanency (Division) urge that we uphold the trial court's decision. We affirm.

I.

We glean the following facts from the extensive record in the case. A.D. was removed by the Division shortly after his birth in October 2017 upon the

---

[1] We use the parties' initials to protect their identities. R. 1:38-3(d)(12).

Division receiving a report regarding S.R.'s inability to supervise him. S.R. has cognitive impairments and suffers from other mental health issues. Her compliance with Division-referred services during the course of this litigation has been sporadic and she has exhibited an inability to retain parenting skills information. S.R. also failed to maintain gainful employment and stable housing and has resided in homeless shelters, motels, and the homes of friends and relatives.

A.D.'s biological father, R.D., refused to take custody of him prior to his removal. Approximately three months later, he was arrested for aggravated assault and possession of a weapon for unlawful purposes with respect to an incident involving S.R. The Division was informed that R.D. allegedly "caused bodily harm to [S.R.] by slashing her arm with a silver knife during a domestic violence dispute." After a jury trial, R.D. was found guilty of negligently causing bodily injury to S.R. with a weapon, contrary to N.J.S.A. 2C:12-1(a)(2), and was released from jail after a seventeen-month period of incarceration.

After his release, R.D. failed to complete a Division referred batterer's intervention program and a parenting skills class. R.D. also suffers from several mental health issues including a schizophrenic disorder and cognitive deficits. In August 2019, he was involuntarily committed to a psychiatric facility because

he was experiencing auditory hallucinations where a voice was telling him to kill people.

Throughout the litigation A.D. has primarily resided in the care of his resource parents, who wish to adopt him. For approximately two months, however, A.D. was placed in his paternal aunt's care. That placement was unsuccessful, and A.D. was eventually placed back in the care of the same resource parents.

The Division presented testimony at trial from caseworker Victoria Burbage and expert psychologist, Dr. Alan J. Lee. The trial judge found both witnesses to be credible.

Dr. Lee performed a psychological evaluation of S.R. and diagnosed her with depressive, anxiety, impulse control, and personality disorders with borderline, narcissistic, and dependent traits, and a likelihood of neurological impairment. Dr. Lee also performed a psychological evaluation of R.D. and diagnosed him with a form of schizophrenia, a personality disorder with antisocial, narcissistic, schizotypal, and paranoid traits, and a neurological impairment similar to that inflicting S.R.

Dr. Lee opined that the prognosis for significant and lasting changes to S.R.'s and R.D.'s parenting deficits was poor. He found that S.R. and R.D. were

4

unlikely to develop the skills necessary to serve as independent caretakers for A.D. within the foreseeable future. Dr. Lee also noted that neither parent would benefit from additional services. Specifically, Dr. Lee found that it was unlikely S.R. "would appreciably change even if additional services were provided" and that R.D. would not "significantly change in the foreseeable future."

Dr. Lee also conducted a bonding evaluation which revealed that A.D. had formed a "significant and positive" psychological attachment and bond with both his resource parents. By contrast, Dr. Lee noted that with respect to S.R., A.D. had "an ambivalent and insecure attachment and relationship with [her]" and that there "is a low risk of [A.D.] suffering severe and enduring harm if his relationship with [S.R.] is permanently ended." Dr. Lee made the same conclusion regarding A.D.'s attachment with R.D.

On January 24, 2020, after considering the evidence, Judge Mary K. White concluded that the Division proved all four prongs of the statutory criteria for termination under N.J.S.A. 30:4C-15.1(a). In particular, the judge found the Division had established by clear and convincing evidence that: A.D.'s safety, health, and development have been and will continue to be endangered; S.R. and R.D. are unable or unwilling to eliminate that harm in the future and that a delay in A.D.'s permanent placement will add to that harm; the Division made

5

reasonable efforts to provide services to S.R. and R.D.; potential alternatives to termination have been sufficiently considered; and termination of parental rights will not cause A.D. more harm than good. Judge White issued a supplemental decision on February 6, 2020, and on March 2, 2020, she issued an addendum which included the legal authority for her decision and specific findings regarding S.R.'s "lack of progress regarding her capacity to parent [A.D.]."

On appeal, S.R. and R.D. assert that the Division failed to establish the four prongs of N.J.S.A. 30:4C-15.1 by clear and convincing evidence. R.D. additionally contends that Judge White erred in shifting the burden of proof to him to prove that he did not have chronic schizophrenia and that he could adequately parent A.D. He also maintains it was improper for the Division to rely on his period of incarceration as grounds for termination. We disagree with both S.R.'s and R.D.'s arguments and affirm substantially for the sound reasons detailed in Judge White's January 24 and February 6, 2020 oral opinions, and March 2, 2020 written addendum.

II.

In reviewing a court's decision to terminate an individual's parental rights, "[t]he scope of our review of [the] . . . court's factual findings is limited." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 476 (App. Div.

6

2012).  "A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings," N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015), because the court "has the opportunity to make first-hand credibility judgments about the witnesses . . . [and] has a 'feel of the case' that can never be realized by a review of the cold record," N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice."  Ibid.  (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).  We must also recognize the expertise of the Family Part, which repeatedly adjudicates cases brought by the Division under Title 9 and Title 30.  See, e.g., N.J. Div. of Youth & Fam. Servs. v. F. M., 211 N.J. 420, 448 (2012).  We review the trial court's legal conclusions de novo.  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A parent's right to maintain a relationship with their child is constitutionally protected.  In re Guardianship of K.H.O., 161 N.J. 337, 346

(1999) (citing <u>Stanley v. Illinois</u>, 405 U.S. 645 (1972)). Courts honor and recognize this right, imposing strict standards for terminating parental rights. <u>Id.</u> at 347. A court may terminate parental rights only if the State proves all four prongs of the "best interests" test. <u>Id.</u> at 347-48, 363. Specifically, before termination can occur, the State must show by clear and convincing evidence that:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. Moreover, "parental fitness is the key to determining the best interests of the child. The considerations involved in determinations of parental fitness are extremely fact sensitive and require particularized evidence that address the specific circumstances in the given case." Ibid. (citations omitted) (internal quotation marks omitted).

### III.

A.    Prong One

With respect to prong one, S.R. argues that Judge White erred in finding that the Division established that A.D.'s safety, health, or development would be endangered by his parental relationship with her. Specifically, S.R. maintains that the record indicates that A.D. did not show any signs of abuse or neglect and that S.R. had the capacity to care for him.

R.D. contends Judge White made erroneous factual findings regarding his mental health condition and in concluding those issues precluded him from safely parenting A.D. We disagree.

Under the first prong, the Division "must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The harm need not be physical, as "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992).

The harm may be established by "a delay in establishing a stable and permanent home." In re Guardianship of DMH, 161 N.J. 365, 383 (1999). "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379 (citing K.H.O., 161 N.J. at 352-54). Additionally, a parent's "persistent failure to perform any parenting functions and to provide . . . support for [the child] . . . constitutes a parental harm to that child arising out of the parental relationship [that is] cognizable under N.J.S.A. 30:4C-15.1(a)(1) and (2)." Id. at 380-81. Moreover, "prolonged inattention by natural parents that permits the development of disproportionately stronger ties between a child and foster parents may lead to a bonding relationship the severing of which would

A-2329-19

cause profound harm—a harm attributable to the natural parents . . . ." In re Guardianship of J.C., 129 N.J. 1, 18 (1992).

Here, the record clearly supports Judge White's finding on prong one. As Judge White noted, S.R. had trouble understanding "how to hold a baby's head, how to feed [with] a bottle, how to just be attuned to this little creature that can't speak." Essentially, S.R. failed to acquire the necessary parenting skills to care for A.D.

Further, throughout the litigation, S.R. was unable to establish "a stable and permanent home." DMH, 161 N.J. at 383. In addition, Dr. Lee concluded that A.D. had developed a positive bond with the resource parents, and termination of that relationship would cause "impulse control problems, disinhibited type behaviors, [and] aggressive behavior."

S.R. maintains that Judge White failed to consider the support of her mother and sister. The record indicates, however, that the Division initially ruled out S.R.'s sister because she had an open Division case. Similarly, the Division had ruled out S.R.'s mother because she had been substantiated for neglect in 1992 and 1999.

R.D. also had unabated mental health issues which Dr. Lee concluded prevented him from parenting at the time of his evaluation, or in the foreseeable

future. At the time of trial, neither parent had been consistently involved in A.D.'s care for over two years. They failed to consistently visit him depriving A.D. of essential nurturing necessary to establish a secure and enduring bond. Their lack of bond with A.D. was replaced by that found between A.D. and his resource parents. Finally, the severance of A.D.'s bond with his resource parents, according to Dr. Lee, would cause A.D. significant harm. That harm alone is sufficient to satisfy prong one. See J.C., 129 N.J. at 18.

B.    Prong Two

S.R. next argues that there was "insufficient evidence to support the trial court's conclusion that [she] was unwilling or unable to eliminate the harm facing A.D. or to provide a safe and stable home for A.D." R.D. maintains that Judge White incorrectly concluded that his "mental illness rendered him unable to parent [A.D.] safely because [he] had been unable to prove" that he did not have chronic schizophrenia. R.D. also claims that Judge White improperly shifted the burden of proof by requiring him to establish whether he suffered from an acute schizophrenic episode or a chronic psychiatric condition. We are not persuaded by any of these arguments.

"The second prong, in many ways, addresses considerations touched on in prong one." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 451 (2012).

12

The focus remains on parental unfitness. K.H.O., 161 N.J. at 352; DMH, 161 N.J. at 378-79. In considering this prong, the court should determine whether it is reasonably foreseeable that the parent can cease to inflict harm upon the child. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 607 (1986).

Under the second prong, parental unfitness can be demonstrated in several ways. K.H.O., 161 N.J. at 352. A party can show that it is reasonably foreseeable that the parents will not or cannot cease to inflict harm upon the child. A.W., 103 N.J. at 607, 615-16. This can be established by proving "parental dereliction and irresponsibility," which can be shown by proof of continued substance abuse, the inability to provide a stable home, and the withholding of nurturing and attention. K.H.O., 161 N.J. at 353. Another manner of establishing the second prong is by demonstrating that removing the child from his or her resource placement would cause serious and enduring mental or emotional impairment. N.J.S.A. 30:4C-15.1(a)(2).

Here, Dr. Lee concluded that A.D. had developed positive bonds with both resource parents. He further determined that if A.D. were removed from the resource parents, he would suffer severe and enduring harm. Dr. Lee also noted that A.D. could suffer from several psychological disorders if separated from

his resource parents including, impulse control problems, disinhibited type behaviors, aggressive behaviors, anxiety, and depression.

S.R. also contends that she was "substantially compliant" with her court ordered services. Although the record confirms that S.R. completed certain services, she was unable to retain the information provided to her. As Judge White noted, S.R. was unable to "acquire the ability, the skills, the stability, the understanding of parenting and child safety and child development to safely care for her child going forward." Further, S.R. missed a significant number of visits with A.D.

S.R. further maintains that Judge White should not have relied on her unstable housing as a basis for her determination. She claims that the judge's conclusion was improper because it was based on her economic and social circumstances. We disagree with S.R.'s characterization of the court's factual findings. Judge White appropriately considered the effect the lack of stable housing would have on A.D. In this regard, it is well settled that evidence of a "a delay in establishing a stable and permanent home" is a relevant consideration when evaluating harm to a child. DMH, 161 N.J. at 383.

Similarly, there was also ample evidence in the record supporting Judge White's decision that the Division established prong two by clear and convincing

evidence with respect to R.D. For example, Dr. Lee concluded that in addition to "some kind of schizophrenia spectrum disorder," R.D. had "chronic maladaptive personality and character traits that include his heightened level of anger and resentment and hostility." R.D. was also involuntarily committed because he had heard voices telling him to kill people.

Further, Dr. Lee determined that R.D. posed a significant risk for criminal recidivism, mental health symptom relapse, as well as substance abuse relapse. Burbage also testified that R.D. failed to complete parenting services and a batterer's intervention program despite his conviction for negligently causing bodily injury to S.R. with a weapon.

With respect to the proofs regarding R.D.'s psychiatric condition, Judge White stated that:

> The [c]ourt doesn't have proof to rule out that you have schizophrenia. I don't know that you have it or that it wasn't some kind of a break . . . . But paranoid schizophrenia is typically a chronic condition. So, I find that the Division's position that we had to at least be able to rule it out, and sir, you were . . . , very cooperat[ive] with those various evaluations or at least that's what I'm going to find. You may disagree with me, but that's what I'm going to find in order to rule it out.

Judge White further noted:

15

[Y]ou and the [c]ourt couldn't get information so as to rule out whether this was a chronic condition, which is treatable with medication, but not if a person says I don't have it—or to just rule it out, because paranoid schizophrenia is a condition, when it does exist, that creates an inability to understand actual reality, which is really important when caring for a toddler, which is what this child is.

This colloquy from Judge White did not shift the burden onto R.D. to prove that he did not have chronic schizophrenia. The judge noted that there was not enough information presented to establish whether he had that condition or not. Nor did Judge White presume that chronic schizophrenia "categorically rendered a parent unfit" as R.D. alleges. Rather, she noted that untreated chronic schizophrenia could be an impediment to caring safely for a small child. After reviewing the record, we are satisfied that Judge White correctly considered R.D.'s mental health history and determined that the Division established prong two by clear and convincing evidence as to each parent.

C.    Prong Three

S.R. claims that the record "demonstrates that [the Division] did not prove, by clear and convincing evidence, that it made reasonable efforts to provide S.R. with services that would assist her in overcoming the conditions that led to the removal of her son." Specifically, S.R. maintains that the Division did not provide services "tailored" to meet her needs. S.R. further argues that the

16

Division bears a "heightened burden" for the provision of its services to her under New Jersey Division of Youth & Family Services v. L.J.D., 428 N.J. Super. 451 (App. Div. 2012). In addition, S.R. contends that the Division's actions were not reasonable because it did not conscientiously follow the recommendations from the therapists who evaluated her.

R.D. argues that the Division failed to establish that it made reasonable efforts to provide him with services during and after his incarceration. Again, we are not persuaded by S.R.'s and R.D.'s contentions.

"Reasonable efforts" are defined as:

> [A]ttempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure, including, but not limited to:
>
> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

The focus is on the Division's efforts toward "reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into [resource parent] care." K.H.O., 161 N.J. at 354. However, "[t]he diligence of [the Division's] efforts . . . is not measured by their success," but rather "against the standard of adequacy in light of all the circumstances." DMH, 161 N.J. at 393.

Here, the Division aided S.R. throughout the litigation. As Judge White noted, the Division "made every effort it could to help [her] with services." In this regard, the Division made referrals and arranged for S.R. to participate in psychiatric, domestic violence, parenting, and substance abuse programs. Further, despite the Division's extensive efforts, Burbage testified that she was unaware of any services that S.R. was engaged in at the time of trial. Although the Division did not provide services in accordance with every recommendation offered by her therapists, the record supports that its efforts were reasonable as defined by N.J.S.A. 30:4C-15.1(c).

S.R. relies on L.J.D. for the proposition that the Division bears a "heightened burden for the provision of its services." In L.J.D., however, the court noted that this heightened burden applies in situations where defendant-parents are also child-clients of the Division. L.J.D., 428 N.J. Super at 489.

Although S.R. was involved with the Division as a child, she was no longer a child-client during the period when she was caring for A.D. Even were we to agree that the Division owed S.R. a heightened duty, we are satisfied the Division met that standard. The services provided to S.R. were extensive and relevant to her parenting deficits.

As to R.D., while he was incarcerated, the Division attempted to contact him on multiple occasions. Indeed, contrary to his claims, the Division met with R.D. at Salem County Correctional Facility on April 11, 2018. While there, the Division discussed "the progress of [his] case, [the] case plan[,] and address[ed] any existing barriers." Further, during this meeting, R.D. declined visitation with A.D. In addition, the Division had scheduled a visit for May 24, 2019, however, when a caseworker called to confirm the visitation, she was informed that R.D. had been released.

When R.D. was released, Burbage testified that R.D. was scheduled for a psychological and bonding evaluation, a batterer's intervention program, random urine screenings, and a substance abuse evaluation. She stated that although it was determined that R.D. did not have a substance abuse problem, he failed to complete the batterer's intervention program. She also noted that R.D. completed an intensive psychiatric outpatient program but by the time of

trial he was not engaged in individual therapy. She also testified that she referred R.D. for parenting services but he did not comply.

Moreover, R.D. was scheduled for supervised visitations within weeks of his release. In addition, R.D. never provided the Division with pay stubs so that they could assist him with making a security deposit on an apartment. Based on the record, Judge White correctly found that the Division made reasonable efforts to provide R.D. with relevant services upon his release from jail.

R.D. also claims that it was unreasonable for the Division to require supervised visits with A.D. Specifically, R.D. maintains that unsupervised visits are the default arrangement unless the Court or the Division "finds a need for supervision." N.J.A.C. 3A:15-1.10(b). We are satisfied that the record supported the need for supervised visitation. Indeed, at the time the court entered the October 17, 2017 removal order, it was provided with the Division's verified complaint which attested to R.D.'s lack of stable housing and purported acts of domestic violence against S.R. Specifically, the court was informed of an incident where R.D. allegedly pushed S.R. "into the bathroom of [a] motel room" and choked her.

D.    Prong Four

S.R. asserts that Judge White erred by relying on the expert opinion of Dr. Lee in her determination that the Division established prong four. As best we can discern, S.R. argues that the court should not have relied upon Dr. Lee's single bonding evaluation between her and A.D. R.D. maintains that Dr. Lee failed to consider all relevant facts regarding his separation from A.D., and events subsequent to his evaluation.

Under prong four, the ultimate question is "whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his] natural parents than from the permanent disruption of [his] relationship with [his resource] parents." K.H.O., 161 N.J. at 355. "[T]he child's need for permanency and stability emerges as a central factor." Id. at 357; see also F.M., 211 N.J. at 453-54 (holding termination of the defendant's parental rights would not do more harm than good where the child's attachment to the resource parent was stronger than the attachment to the legal parent); N.J. Div. of Child Prot. & Permanency v. P.D., 452 N.J. Super. 98, 122-23 (App. Div. 2017) (finding the fourth prong satisfied upon expert testimony that the severing of the child's relationship with the resource parent would cause

21                                                                          A-2329-19

"severe and enduring harm," while the child had "no bond" with the legal parent).

Dr. Lee concluded that A.D. had "an ambivalent and insecure attachment with [S.R.]" and that this was "not a significant and positive bond." He further noted that "there is a low risk of [A.D.] suffering severe and enduring harm if his relationship with [S.R.] is permanently ended." Moreover, Dr. Lee testified that A.D. did not "show any kind of overt joy, happiness, or smiling when he saw [S.R.]" and "showed rather limited eye contact with [her]." Further, as noted, Dr. Lee concluded that A.D. would not suffer severe and enduring harm if his relationship was terminated with S.R. In contrast, however, Dr. Lee found that A.D. would suffer significant harm if his relationship with the resource parents was terminated.

Similarly, with respect to R.D., Dr. Lee noted that A.D. had an "ambivalent and insecure attachment" with him and that this was "not a significant and positive bond." Accordingly, he concluded that there was "a low risk of [A.D.] suffering severe and enduring harm if his relationship with [R.D.] [was] ended permanently." Dr. Lee also stated that A.D. did not show "any kind of overt joy or happiness" when R.D. picked him up and that "there was no conversation or dialogue of any sort" between the two. Thus, we are satisfied

22

that Judge White properly relied upon Dr. Lee's testimony in finding that the Division established prong four by clear and convincing evidence. F.M., 211 N.J. at 453-54.

## IV.

Finally, R.D. argues that his substantive due process rights were violated because the State effectively made him unavailable to A.D. by incarcerating him for seventeen months during this litigation. Specifically, R.D. argues Judge White "explicitly penalized [him] for being unavailable during his incarceration" and that his imprisonment made it "virtually impossible for [R.D.] to prevail on other points" and to bond with his son. We disagree.

Our Supreme Court has made it very clear that a parent's incarceration alone is not a sufficient legal basis for termination. See, e.g., In re Adoption of Children by L.A.S., 134 N.J. 127, 143 (1993); N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 556 (2014) ("We therefore reiterate that incarceration alone—without particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard—is an insufficient basis for terminating parental rights."). There is no doubt that "incarceration is a relevant factor in resolving termination of parental rights cases." R.G., 217 N.J. at 555. Even so, "it is by no means settled or obvious that incarceration is so

inimical to [the parental] relationship as to justify its termination as a matter of law." Ibid. (quoting L.A.S., 134 N.J. at 137).

We are satisfied that the court did not base its termination decision solely on R.D.'s incarceration or otherwise violate his due process rights. As Dr. Lee noted, R.D.'s "mental health issues, his risk[s] for impulse control problems, . . . criminal recidivism, . . . substance abuse, . . . aggressive behaviors, his lack of knowledge of parenting and child rearing, his limited insight and awareness . . . have an adverse impact on his ability to consistently and properly carry out a minimal level of parenting." Prior to R.D.'s incarceration, when the Division was trying to arrange a supervisor for S.R., instead of agreeing to do so, he simply stated that S.R. "knows what she should do as a mother and if she does not then she has to face the consequences." Further, when R.D. was incarcerated, he initially declined visitation with A.D.

We also reject R.D.'s argument that the court relied too heavily on the circumstances that led to his incarceration stating that "a jury determined that [he] was guilty at most of negligence." In fact, R.D. was convicted of negligently causing bodily injury to the mother of his child contrary to N.J.S.A. 2C:12-1(a)(2), a significant offense. We are satisfied that the court properly evaluated the circumstances underlying his incarceration and correctly applied

24

those facts to the governing law and did not otherwise violate R.D.'s substantive or procedural due process rights.

To the extent we have not addressed any other arguments raised by S.R. and R.D., it is because we have concluded they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2329-19