# RECORD IMPOUNDED

### NOT FOR PUBLICATION WITHOUT THE
### APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2622-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.P.,

     Defendant-Appellant,

and

T.K.B.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF S.K.,
a minor.

_____

Submitted March 23, 2021 – Decided April 22, 2021

Before Judges Mawla and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0049-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Christine Olexa Saginor, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Rachel E. Seidman, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In this appeal, K.P. (Ken)[1] challenges a February 7, 2020 Family Part order terminating his parental rights to S.K. (Sara), his daughter. The Law Guardian and the Division of Child Protection and Permanency (Division) urge that we uphold the trial court's decision. We affirm.

I.

We glean the following facts from the voluminous record in the case. Sara

---

[1] We use pseudonyms to protect the identity of the parties. R. 1:38-3(d)(12).

was born in 2014 to T.K.B. (Tammy) and Ken.[2] Tammy is also the mother of J.K. (Jenna), who is approximately five years older than Sara, and two other children. Ken lived with Tammy for approximately a month when Sara was born but was arrested in March 2014 and sentenced to an approximate four-year prison term. Sara continued to reside with Tammy and her siblings after Ken's arrest. Sara did not visit with Ken during his incarceration.

In June 2017, while Ken was still in prison, Tammy was involuntarily committed to a psychiatric unit. The Division immediately took custody of Sara, then three-years-old, and her siblings, and filed a verified complaint for their continued care and custody. The court granted temporary custody to the Division, and Sara and Jenna were placed with J.L. (Julie), a non-relative resource parent, and her husband where they remain to date.

In July 2017, J.P. (Jane), Ken's mother, contacted the Division to indicate that she and her husband W.P. (Wyatt), would like to care for Sara, but not her siblings. Jane told the Division, however, that she did not have an extra bedroom and she has had very little contact with Sara since Ken's incarceration. She also

---

[2] As noted <u>infra</u> at page 8, Tammy voluntarily surrendered her parental rights to Sara and has not participated in this appeal.

A-2622-19

informed the Division that Ken forged a court order stating Ken was not Sara's father.[3]

Jane contacted the Division again in August 2017 and was told Sara could not be placed in her home because the residence lacked a suitable sleeping space for her. In response, Jane indicated that she and Wyatt would sleep in the living room to enable Sara to have her own room.

The Division informed Jane that its primary goal at that time was to reunify Sara with Tammy. Sara visited Jane and Wyatt in April 2018, and the Division continued exploring them as a placement option for Sara, but remained concerned about separating Sara from Jenna.

On May 10, 2018, the trial court ordered Ken to complete a psychological evaluation. The court also permitted visitation between Ken and Sara after his release from prison in June 2018. Shortly thereafter, the court ordered that Sara remain in the Division's care and custody and approved the Division's permanency plan of termination of parental rights followed by resource home adoption. The court concluded that Sara has "been in placement for a year and [she] deserve[s] permanency."

---

[3] Ken initially disputed he was Sara's biological father. Accordingly, the court ordered a paternity test which confirmed he was Sara's father.

A-2622-19

Despite the change in the Division's permanency plan, the Division nevertheless continued to coordinate visits between Ken and Sara. It also provided Ken with services to assess the viability of reunifying him with Sara.

The Division's expert, Mark Singer, Ed. D., conducted psychological and bonding evaluations with Ken, Tammy, Jane, Wyatt, and Tammy's parents. With regard to Ken, Dr. Singer concluded that it was clear Ken "absented himself from [Sara's] life[] through his criminal behavior and his declining visitation. The lack of consistent contact between [Ken] and [Sara] was evident during the bonding evaluation." He also found "the objective test data suggest that [Ken] has a history of engaging in anti[-]social acts" and "is likely to have difficulty adhering to limits placed upon his behavior . . . ."

As to Jane and Wyatt, Dr. Singer noted that "their relationship with [Sara] has clearly been disrupted due to [Ken]'s reported behavior" and they were in the early stages of developing a relationship. Comparatively, Dr. Singer concluded Sara formed "meaningful attachments" to Tammy, Tammy's parents, and Julie.

Dr. Singer also noted that any placement considerations for Sara should address that "separat[ing Sara and Jenna] would likely have a significant negative impact upon both girls" and that Sara's "need for permanency and

stability is paramount." He explained that Ken would not be a viable parenting option for Sara and noted Sara would "not likely . . . experience a negative reaction to the loss of her relationship with her father." He also stated that "[t]he data does not support a recommendation to place" Sara with Jane and Wyatt, but that unsupervised visitation without Ken present would not create any undue risk of harm to Sara.

According to Dr. Singer, Sara viewed her resource parents as her psychological parents and that severing that relationship would cause "significant and enduring harm . . . that none of the other participants in [the] evaluation can mitigate . . . ." Ultimately, Dr. Singer recommended the Division continue pursuing termination of Ken's parental rights and permanent placement of Sara with Julie.

Leslie Trott, Ed. D., also performed a psychological and bonding evaluation with Ken on January 2, 2019. Dr. Trott found Ken "demonstrate[d] significant anti[-]social tendencies impairing his ability to parent safely and successfully" and that "a child in [his] care will be at risk." Dr. Trott further explained that "it [wa]s apparent that a parent/child emotional bond does not exist" between Ken and Sara. He concluded "[n]o evidence collected here supports [Sara] being placed with her biological father."

A-2622-19

Dr. Trott determined, however, "there was a very close relationship between [Jenna] and [Sara], and . . . an equally close relationship between [Sara] and her [placement] mother." He found "to interrupt [these relationships] would erase" any chance Sara has "to be inoculated against mental illness in the future."

Notably, Dr. Singer conducted a second evaluation of Ken in January 2019 and altered his recommendation from termination of Ken's parental rights to reunification with Sara because "it had seemed on some level that [Ken] had learned from some of his experiences." Based on Dr. Singer's updated evaluation and other collateral information, and notwithstanding Dr. Trott's conclusion, the Division voluntarily dismissed its guardianship action and changed its permanency goal to reunification of Sara with Ken.

Between June 2018 and April 2019, Ken visited Sara twenty-five times but failed to appear or canceled his visits seventeen other times. Six other visits were canceled for reasons unrelated to Ken's availability. Jane and Wyatt attended eight of Ken's visits with Sara.

In April 2019, the Division terminated Ken's visitation services because of his inability to keep scheduled appointments. Ken also tested positive for drug use in violation of his parole and was required to attend a residential program for substance abuse. While attending the program, Sara refused to visit

A-2622-19

Ken by "hysterically crying, clinging to either [her] resource mom . . . [or Jenna], and she was not able to be consoled."

In May 2019, Tammy completed an identified surrender of her parental rights to Sara, and approximately two weeks later the Division changed its permanency goal from reunification to termination of Ken's parental rights and accordingly filed a new guardianship complaint. Sara continued to refuse to see Ken.

Dr. Trott performed a clinical assessment of Sara on July 24, 2019, and noted:

> [Sara] is now demonstrating heightened anxiety and severe emotional distress when approached to visit [Ken, Jane, and Wyatt]. She refuses, cries loudly, demonstrating additional emotional distress and behavioral resistance. Resulting emotional turmoil is now "spilling over" into other moments in her daily life. She reportedly is having sleep difficulties, her appetite has changed[,] and she is having toileting accidents.

He also explained that by visiting Ken and his parents, Sara has "come to realize she may be separated from her sister [Jenna] and her foster family," which is causing a separation anxiety disorder. As a result, Dr. Trott recommended that Sara cease visiting with Ken, Jane, and Wyatt. On July 31, 2019, after the release from his residential substance abuse program, Ken was reincarcerated for testing positive for drug use in violation of his parole.

8

At trial, the Division presented testimony from a Division caseworker and Dr. Singer. The caseworker testified that Jane and Wyatt were not initially considered for placement in August 2017 because Tammy still maintained her parental rights, Sara's maternal grandparents were still being explored as a potential placement, the Division was attempting to keep Sara and her siblings together, and Jane and Wyatt's home had not yet been approved by the Division's licensing process.

Dr. Singer testified that Ken was not a viable option for Sara's permanent placement. He noted that Sara's "need for permanency, for stability and consistency . . . outweighs delaying permanency" and that Ken placed himself on a "negative trajectory" after relapsing and violating parole. Dr. Singer explained he altered his recommendation after his second evaluation of Ken because it appeared Ken had learned from some of his experiences, but testified Ken's reunification with Sara was no longer a viable option because of his reincarceration.

The Law Guardian presented testimony from Dr. Trott and Julie. Dr. Trott similarly testified that neither Ken nor his parents were viable placement options. He stated that he could not complete a second bonding evaluation between Sara and Ken and his parents because Sara was "demonstrating

9

significant distress" related to visiting with them. Julie stated that she and her spouse were committed to adopting Sara.

Gerard Figurelli, Ph.D., testified on Ken's behalf and expressly limited his opinion "to whether or not [Jane and Wyatt] could parent a minor child." In this regard, he stated he could not "draw any conclusions as to whether or not it[ was] in [Sara]'s best interests to be removed from her current placement [with Julie] and then placed with [Jane and Wyatt]" because it was beyond the scope of his evaluation.

After considering the testimonial and documentary evidence, Judge Michael C. Gaus issued a February 7, 2020 order and fifty-six-page written decision in which he concluded the Division established by clear and convincing evidence all four prongs of the statutory criteria for termination of parental rights under N.J.S.A. 30:4C-15.1(a)(1) to (4). In particular, the judge found the Division established: Ken's "inadequate and unavailable parenting caused [Sara] to be placed at a substantial risk of developmental harm," N.J.S.A. 30:4C-15.1(a)(1); Ken was "unable or unwilling to eliminate the harm that has endangered [Sara] and the parental relationship" particularly because of Ken's failed efforts at reunification, N.J.S.A. 30:4C-15.1(a)(2); the Division made reasonable efforts to reunify Sara with Ken and considered alternatives to

A-2622-19

termination of Ken's parental rights, including the adequacy of placement with Jane and Wyatt, N.J.S.A. 30:4C-15.1(a)(3); and termination of Ken's parental rights will not cause Sara more harm than good, N.J.S.A. 30:4C-15.1(a)(4).

Judge Gaus found that Drs. Singer and Trott provided credible testimony and relied upon their opinions in deciding to terminate Ken's parental rights. The judge, however, gave Dr. Figurelli's opinions less weight because he failed to "counter any of [Drs. Singer and Trott's] conclusions and opinions" and he "was unable to offer any child specific recommendations or conclusions that related to [Sara]."

On appeal, Ken challenges only Judge Gaus's prong three and four findings, arguing that: 1) the Division failed to provide services to Sara to address her refusal to visit Ken or his parents, 2) the Division failed to properly consider Jane and Wyatt as a potential placement for Sara, and 3) the court gave undue weight to the experts retained by the Division and the Law Guardian.[4]

---

[4] Ken does not contest the court's findings under the first or second prong of the best interests test, and we therefore consider any challenge to the court's findings on those prongs waived. See Telebright Corp. v. Dir., N.J. Div. of Tax'n, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2021) ("[A]n issue not briefed is deemed waived."). We have nevertheless reviewed the court's prong one and two findings and are satisfied they are supported by

We disagree with all of these arguments and affirm the court's February 7, 2020 order substantially for the reasons detailed in Judge Gaus's comprehensive written opinion. We provide the following comments to amplify our decision.

## II.

In reviewing a court's decision to terminate an individual's parental rights, "[t]he scope of our review of [the] . . . court's factual findings is limited." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 476 (App. Div. 2012). "A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings," N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015), because the court "has the opportunity to make first-hand credibility judgments about the witnesses . . . [and] has a 'feel of the case' that can never be realized by a review of the cold record," N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to

---

substantial, credible evidence in the record and the court's legal conclusions are unassailable.

ensure that there is not a denial of justice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). We must also recognize the expertise of the Family Part. See, e.g., N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). We review the trial court's legal conclusions de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A parent's right to maintain a relationship with his or her child is constitutionally protected. In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999) (citing Stanley v. Illinois, 405 U.S. 645 (1972)). Courts honor and recognize this right, imposing strict standards for terminating the parent-child relationship. Id. at 347. However, our public policy is that "[a] child cannot be held prisoner of the rights of others, even those of [the] parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). "Keeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." L.J.D., 428 N.J. Super. at 484 (quoting N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001)).

A-2622-19

A court may terminate parental rights only if the Division proves all four prongs of the "best interests" test. K.H.O., 161 N.J. at 347-48, 363. Specifically, before termination can occur, the Division must show by clear and convincing evidence that:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J.

at 348. Moreover, "parental fitness is the key to determining the best interests of the child. The considerations involved in determinations of parental fitness are extremely fact sensitive and require particularized evidence that address the specific circumstances in the given case." Ibid. (citations omitted) (internal quotation marks omitted).

III.

Ken first argues the court erred in concluding the Division satisfied prong three. He specifically maintains the Division acted unreasonably in failing to provide services to Sara to mitigate her separation anxiety disorder, and to address her refusal to visit him and his parents after June 2019. Ken also blames Tammy's "unstable home life" on Jenna taking a "parentified" role over Sara. We reject all of these arguments.

N.J.S.A. 30:4C-15.1(c) defines reasonable efforts as those reasonable "attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure." The statute lists examples of "reasonable attempts" at reunification, including but not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;

15

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

The focus is on the Division's efforts toward "reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into [resource parent] care." K.H.O., 161 N.J. at 354. However, "[t]he diligence of [the Division]'s efforts . . . is not measured by their success," but rather "against the standard of adequacy in light of all the circumstances . . . ." In re Guardianship of DMH, 161 N.J. 365, 393 (1999).

Here, Judge Gaus's finding that the Division used reasonable efforts to provide services to Ken is amply supported by substantial credible evidence in the record. The Division consistently worked with Ken towards reunification with Sara despite his unpredictable attendance at visitations. The Division also scheduled numerous psychological and bonding evaluations to address Sara's best interests and properly consider placement with either Tammy's parents or

Jane and Wyatt. It also provided various services specific to Ken including individual therapy and pre- and post-adoption counseling.

Further, the Division changed its permanency plan in January 2019 from termination of parental rights to reunification and dismissed its guardianship action contrary to Dr. Trott's findings. Ultimately, however, the permanency plan was reverted back to termination of parental rights due to Ken's subsequent reincarceration, his inconsistent efforts towards reunification with Sara, and her need for permanency.

We also reject Ken's claim that the Division failed to address appropriately Sara's separation anxiety disorder. As Dr. Trott's diagnosis established, Sara was experiencing physical manifestations from her separation anxiety starting in April 2019. The Division's case worker testified that the Division repeatedly tried to counsel Sara once she started to refuse visiting Ken. After those efforts proved unsuccessful, the Division asked Jenna to assist it in supporting the visits and even tried to facilitate phone contact between Sara and Ken at the recommendation of a counselor. Ken's position disregards Dr. Trott's diagnosis and fails to acknowledge his own role in creating an unstable environment for Sara.

A-2622-19

Even if Sara was eventually able to overcome her separation anxiety, Ken began repeating his pattern of anti-social behavior that both Drs. Singer and Trott warned about in January 2019. Ken offers no explanation as to what the Division could have done in light of his own behavior, including his resulting reincarceration, and failure to attend a significant portion of visitations with Sara. Considering the Division's efforts in light of all of the circumstances, Judge Gaus did not err in concluding its efforts were reasonable.

IV.

Ken further contends the Division did not properly consider his parents as placement options for Sara and "failed [his] family by unjustifiably prolonging the licensing and placement process for [Jane and Wyatt], with whom Sara had a prior relationship . . . ." Relying on New Jersey Division of Youth and Family Services v. A.W., 103 N.J. 591, 610 (1986), he argues "placement of a child with a relative would satisfy the best interests of the child standard . . . ." Further, he suggests Sara should have been placed with Jane and Wyatt because "there [was] no credible evidence in the record which establishes that the[y] . . . posed any risk of harm to Sara." Again, we disagree.

A court is required to consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). "[A]ssessment of relatives is part of the

A-2622-19

Division's obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family structure." N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 583 (App. Div. 2011).

N.J.S.A. 30:4C-12.1(a) requires the Division to initiate a search for relatives who may be willing and able to provide the care and support required by the child within thirty days of accepting a child into its care or custody. The Division must assess each interested relative and, if it determines that the relative is unable or unwilling to care for the child, inform them of its reasons for a denial of placement. N.J.S.A. 30:4C-12.1(a), (b).

"It is the policy of [the Division] to place, whenever possible, children with relatives when those children are removed from the custody of their parents." N.J. Div. of Youth & Fam. Servs. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002). However, there is no presumption in favor of a relative. N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 82 (App. Div. 2013). "[U]ltimately the question is what was in [the child's] best interest[s] based upon the circumstances as they existed at the time of the final hearing . . . ." N.J. Div. of Youth & Fam. Servs. v. M.F., 357 N.J. Super. 515, 527 (App. Div. 2003).

As the Division explained during trial, Jane and Wyatt were not initially considered as a placement option for Sara in 2017 because Tammy still

maintained her parental rights, Sara's maternal grandparents were still being explored as a potential placement, the Division was attempting to keep Sara and her siblings together, and Jane and Wyatt's home had not yet been approved by the Division.  Further, as Judge Gaus noted, any delay in reviewing Jane and Wyatt as a placement option was caused in part by Ken initially denying that he was Sara's biological father.

Further, Drs. Singer and Trott both concluded that Sara's placement with Jane and Wyatt was not in her best interests.  Despite documentation of positive interactions between Sara and her paternal grandparents, Dr. Singer testified that Sara did not have a meaningful relationship with them, and that separating Sara from Jenna or Julie would cause significant harm that Jane and Wyatt would not be able to mitigate.

Defendant's reliance on A.W., 103 N.J. at 591, is misplaced.  In that case, our Supreme Court articulated the four-prong test later codified in N.J.S.A. 30:4C-15.1(a).  Regarding the third prong, the Court noted the "[l]egislative and judicial policy have dictated that the child's best interests be protected so far as practicable by providing welfare services to support and maintain the integrity of the biological family as a living unit."  Id. at 608 (citation and internal quotation marks omitted).  One alternative, the court suggested, is placement

with relatives "until the parents can resume custody" because then "the child's needs for stability and attachment are satisfied." Id. at 609 (citation omitted).

Notably, the Supreme Court in A.W. did not require a child's placement with relatives if it is not in the child's best interests. Here, the Division and Judge Gaus considered Jane and Wyatt as potential placements for Sara but ruled them out as contrary to Sara's best interests. The judge also did not "rel[y] on inappropriate factors in reaching [the] determination," which was the basis for remand in A.W. Id. at 617 (reversing the denial of termination and remanding for "reconsider[ation] by a new fact-finder").

## V.

Finally, Ken argues Judge Gaus gave "undue weight" to Drs. Singer and Trott's testimony when he concluded that terminating his parental rights would not do more harm than good. Specifically, he contends Drs. Singer and Trott's opinions were "flawed" because "[n]either expert reviewed the voluminous visitation records before rendering [their] opinions . . . ." Additionally, he argues Drs. Singer and Trott failed to complete a comparative bonding evaluation. Ken maintains that the court should have followed Dr. Figurelli's recommendation which "provided the trial court with credible evidence of [Jane

and Wyatt's] fitness to care for Sara . . . ."  Again, we are not persuaded by any of these arguments.

The ultimate question under prong four is "whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [their] natural parents than from the permanent disruption of [the] relationship with [their resource] parents."  K.H.O., 161 N.J. at 355.  "[T]he child's need for permanency and stability emerges as a central factor."  Id. at 357; see also F.M., 211 N.J. at 453-54 (holding termination of the defendant's parental rights would not do more harm than good where the child's attachment to the resource parent was stronger than the attachment to the legal parent); N.J. Div. of Child Prot. & Permanency v. P.D., 452 N.J. Super. 98, 122-23 (App. Div. 2017) (finding the fourth prong satisfied upon expert testimony that the severing of the child's relationship with the resource parent would cause "severe and enduring harm," while the child had "no bond" with the legal parent).  We also consider "the effect of permanently terminating [the child]'s connection to his [or her] siblings . . . ."  In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002).

Prong four is typically satisfied by expert testimony based on a comparison of bonding evaluations.  See N.J. Div. of Child Prot. & Permanency

v. N.C.M., 438 N.J. Super. 356, 371 (App. Div. 2014) (stressing the need for "well[-]qualified expert" testimony concerning bonding evaluations (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992))); L.J.D., 428 N.J. Super. at 492. Indeed, to weigh any potential harm from terminating parental rights against a child's separation from their foster parents, a court must consider expert testimony on the strength of each relationship. J.C., 129 N.J. at 25.

Here, Judge Gaus's finding on prong four is fully supported by the record and, specifically, Drs. Singer and Trott's expert opinions. As noted, Dr. Singer testified that Sara viewed Julie as her psychological parent and that she would not experience a negative reaction to losing her relationship with Ken. Dr. Trott also concluded that Sara would be at risk under Ken's care and also stated that Sara's bonds with Jenna and Julie "might be the best chance she has to be inoculated against mental illness in the future." As such, Judge Gaus did not err by relying on Drs. Singer and Trott's opinions in concluding the Division satisfied prong four. See N.C.M., 438 N.J. Super. at 371.

We also disagree with Ken's argument that the court afforded too much weight to Drs. Singer and Trott's opinions because they did not review previous visitation reports and did not complete updated bonding evaluations. The weight to be afforded those experts' opinions was entirely within the court's discretion,

which we are satisfied the judge did not abuse. See Cnty. of Middlesex v. Clearwater Vill., Inc., 163 N.J. Super. 166, 173-74 (App. Div. 1978) ("[T]he trial judge as the factfinder is not bound by the [testimony] . . . of the experts on either side . . . [and] may adopt so much of it as appears sound, reject all of it, or adopt all of it." (Citation and internal quotation marks omitted)). Further, the visitation reports did not reflect the relationship between Ken and Sara at the time of either expert's evaluations. Updated bonding evaluations at the time of trial could not be completed because of the physical manifestation of separation anxiety that Sara was experiencing.

Finally, we reject Ken's argument that the court erred in failing to rely upon Dr. Figurelli's opinions. As noted, Dr. Figurelli's conclusions related only to Jane or Wyatt's ability to care for a minor child generally. Dr. Figurelli did not make any findings specific to Jane and Wyatt's ability to care for Sara or her bests interests because it was beyond the scope of his evaluation.

In summary, we discern no basis to set aside Judge Gaus's well-supported and well-reasoned decision to terminate Ken's parental rights. To the extent we have not addressed any other arguments raised by Ken, it is because we have concluded they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2622-19