**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2646-13T1

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

    Plaintiff-Respondent,

v.

K.T.D.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.K.S.,

    a minor.

_____

<table>
<tr><td>

**APPROVED FOR PUBLICATION**

**February 20, 2015**

**APPELLATE DIVISION**

</td></tr>
</table>

Submitted November 19, 2014 — Decided February 20, 2015

Before Judges Fuentes, Ashrafi and O'Connor.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Camden
County, Docket No. FG-04-0112-14.

Joseph E. Krakora, Public Defender, attorney
for appellant (Durrell Wachtler Ciccia,
Designated Counsel, on the brief).

John J. Hoffman, Acting Attorney General,
attorney for respondent (Lisa A. Puglisi,
Assistant Attorney General, of counsel;

Michelle D. Perry-Thompson, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Phyllis G. Warren, Designated Counsel, on the brief).

The opinion of the court was delivered by

O'CONNOR, J.A.D.

Defendant K.T.D. (mother) appeals a final judgment entered by the Family Part terminating her parental rights to her daughter, Ann,[1] born in 2012. Ann has been in the custody of the Division of Child Protection and Permanency (the Division) since she was six days old. At the time of trial, Ann was in the physical custody of a family friend, Beth, who has had physical custody of Ann since she was six weeks old and wishes to adopt her. The identity of Ann's father is unknown. For the reasons that follow, we remand for further proceedings.

I

On the day Ann was born, the Division received a referral that the mother and baby tested positive for Phencyclidine (PCP). The Division filed a verified complaint for the care, custody, and supervision of Ann pursuant to N.J.S.A. 9:6-8.21,

---

[1] To protect their privacy, we refer to Ann and others connected to this litigation by fictitious names, although for clarity we we refer to K.T.D. as either the mother or K.T.D.

A-2646-13T1

N.J.S.A. 30:4C-12, and Rule 5:21-1, and subsequently obtained legal custody of the baby.

The mother has a long-standing history of abusing PCP. Despite participating in numerous substance abuse treatment programs, she has been unable to overcome her addiction. When Ann was born the mother had two other children, but both had been removed from her care; a relative now has kinship legal guardianship over these children. Four months after Ann's birth, the mother moved to Colorado and has visited Ann only three times since. The mother did not comply with any court ordered services and, throughout the litigation, tested positive for drugs or refused to submit to drug tests, creating the inference she would have tested positive had she submitted a urine sample to the Division.

On July 25, 2013, the Division filed a complaint for guardianship. At a compliance review hearing held on October 21, 2013, the mother informed the court that she was part Native American, specifically, Cherokee, as were both of her parents. She was not, however, an "enrolled" or "registered" member of any Cherokee tribe. At that time, the mother provided the names of her parents and three out of her four grandparents, including the maiden name of one grandmother. She did not know the birth dates of either parent or any of her grandparents, but was

instructed to submit this information to the Division. The mother was not asked to provide any other information.

The mother did not give the Division the requested information or provide any other details about her forebears' Cherokee heritage, but during a pretrial conference held on January 9, 2014, the court indicated the Division planned to contact K.T.D.'s mother for additional information about the family's Native American background. The guardianship trial was held shortly thereafter, on January 23 and 30, 2014.

During the trial the Division called psychologist Linda Jeffrey, Ph.D., as an expert witness. The court found Dr. Jeffrey "highly credible." She testified the mother had a "very serious constellation of issues," which included not only a marked and unrelenting dependence on substances, but also severe mental health afflictions. These included unspecified schizophrenia spectrum disorder, borderline paranoia, and intermittent explosive disorder. The expert opined the mother was not able to safely parent Ann, and there was no bond between the child and the mother. Ann, however, was securely attached to Beth; if Ann were removed from Beth's care, Ann would suffer severe and enduring harm. In addition to Dr. Jeffrey, a Division caseworker also testified and recounted the services made available to the mother in both New Jersey and Colorado.

K.T.D.'s mother, Edna, testified that two of Ann's great, great grandmothers were part Native American. One great, great grandmother was from K.T.D's father's side and the other was from Edna's side of the family. One was half Cherokee, but Edna did not know if she had ever been registered or affiliated with a tribe. Edna provided the name and maiden name of this relative. The other great, great grandmother was "half Indian," but was never affiliated or registered with any tribe. Edna mentioned her name and testified that she was "still digging" to find out if other members of the family were affiliated with a Native American tribe.

At the conclusion of the guardianship trial, the trial court found that the Division met the four prongs in N.J.S.A. 30:4C-15.1(a)[2] by clear and convincing evidence and terminated the mother's parental rights to Ann.

---

[2] These four prongs are:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and

A-2646-13T1

A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citing N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)). Further, appellate courts should defer to decisions made by a Family Part judge that are heavily dependent upon the judge's credibility determinations. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552-53 (2014).

---

enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

Here, we find unassailable the trial court's conclusion that all four prongs in N.J.S.A. 30:4C-15.1 were proven by clear and convincing evidence. The mother's claim that the Division failed to prove these statutory factors is devoid of merit and does not warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). However, the mother also argues a remand is warranted so that the Cherokee tribes and the Department of Interior, Bureau of Indian Affairs (BIA), can be notified of the termination proceedings. We agree.

### III

The Indian Child Welfare Act of 1978, 25 U.S.C.A. §§ 1901-1963 (ICWA) was enacted to protect and preserve Native American families by limiting the ability of state courts to remove an Indian child from his or her family. See Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32, 109 S. Ct. 1597, 1599-600, 104 L. Ed. 2d 29, 36 (1989). The legislative history of the ICWA emphasized that the "separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today." H.R. Rep. No. 95-1386 (1978). The Congressional findings accompanying the ICWA state that Indian children are essential to the continued existence and integrity of Indian tribes, 25 U.S.C.A. § 1901(3), and vests in the ICWA control over the custody, adoption, and termination of

parental rights of Indian children.  In re Adoption of Child of Indian Heritage, 219 N.J. Super. 28, 31 (App. Div. 1987), aff'd 111 N.J. 155 (1988).

The ICWA contains a provision requiring that in any termination of parental rights proceeding where a state court knows or has reason to know that the child involved is an "Indian child," the child's tribe or, if the tribe cannot be identified, the BIA, must be notified of the proceeding.  25 U.S.C.A. § 1912(a).  The purpose of giving notice is to give the Indian tribe the opportunity to determine whether the child is an "Indian child" as defined by the ICWA, see In re Jeffrey A., 127 Cal. Rptr. 2d 314, 317 (Cal. Ct. App. 2002), and, if so, to intervene in the termination proceeding.  Indian tribes have exclusive authority to determine who is a member or eligible for membership in a tribe.  Ordinance 59 Ass'n v. U.S. Dep't of Interior Sec'y, 163 F.3d 1150, 1153 n.3 (10th Cir. 1998).

Indian tribes have the right to intervene under the ICWA because they have an interest in Indian children that is commensurate with that of a parent. "The numerous prerogatives accorded the tribes through the ICWA's substantive provisions . . . must . . . be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves."  Miss. Band of Choctaw Indians,

supra, 490 U.S. at 49, 109 S. Ct. at 1609, 104 L. Ed. 2d at 47; See In re Adoption of Halloway, 732 P.2d 962, 969 (Utah 1986) (Indian tribes have "an interest in the child which is distinct from but on a parity with the interest of the parents.").

Moreover, under the ICWA the burden of proof imposed upon the party seeking to terminate a party's parental rights is beyond a reasonable doubt. 25 U.S.C.A. § 1912(f). Specifically, the moving party in a termination proceeding must prove beyond a reasonable doubt that the child is likely to suffer serious emotional or physical damage if left in the parent's custody. Ibid. Further, if an Indian child is to be adopted, in the absence of good cause to the contrary, preference must be given to placement with a member of the child's extended family, other members of the Indian child's tribe, or other Indian families. 25 U.S.C.A. § 1915(a). The failure to give notice can have very serious consequences. A tribe can petition a court to invalidate a judgment terminating parental rights if notice was not provided in compliance with the ICWA. 25 U.S.C.A. § 1914.

The ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian

A-2646-13T1

tribe."  25 U.S.C.A. § 1903(4).  Tribes have different criteria of what constitutes being a member of a tribe, and being registered or enrolled is not necessarily determinative of whether a person is a member of a particular tribe.  See U.S. v. Broncheau, 597 F.2d 1260, 1263 (1979).  Some tribes recognize a person as a member if he is a descendant of a tribal member who was listed on the tribal rolls as of a specific date.  For example, the Constitution of the Cherokee Nation of Oklahoma[3] states that one can be a citizen of that tribe if he or she is either an original enrollee or a descendant of an original enrollee who was listed on the Dawes Commission Rolls.[4]  Const. of the Cherokee Nation, art. III, § I.  Other tribes require a certain quantum of tribal blood or residency on a reservation to be deemed a member.  Broncheau, supra, 597 F.2d at 1263.

---

[3] There are three Cherokee tribes recognized by the federal government:  the Cherokee Nation of Oklahoma; the Eastern Band of Cherokee Indians of North Carolina; and the United Keetoowah Band of Cherokee Indians in Oklahoma.  Indian Entities Recognized and Eligible to Receive Services from the U.S. Bureau of Indian Affairs, 68 Fed. Reg. 68180, 68181, 68183 (Dec. 5, 2003).

[4] The Dawes Commission was appointed by Congress in 1893 to negotiate with the "Five Civilized Tribes," including the Cherokee, to compile tribal membership rolls to determine eligibility for allotment of tribal lands.  Witt v. United States, 681 F.2d 1144, 1147, 1148 n. 8 (9th Cir. 1982); see generally Stephens v. Cherokee Nation, 174 U.S. 445, 19 S. Ct. 722, 43 L. Ed. 1041 (1899).

The BIA has issued guidelines to assist in interpreting the ICWA. See Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67584 (Nov. 26, 1979). While not binding upon state courts, they are helpful in interpreting provisions in the ICWA. See In re Adoption of a Child of Indian Heritage, supra, 219 N.J. Super. at 41 (citing In re Junious M., 193 Cal. Rptr. 40 (1983)). The guidelines address the circumstances under which a court should have reason to believe a child is Indian. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67584, 67586 (Nov. 26, 1979). These non-exclusive circumstances occur when:

> (i) any party to the case, Indian tribe, Indian organization or public or private agency informs the court that the child is an Indian child.
>
> (ii) any public or state licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.
>
> (iii) the child who is the subject of the proceeding gives the court reason to believe he or she is an Indian child.
>
> (iv) the residence or the domicile of the child, his or her biological parents, or the Indian custodial is known by the court to be or is shown to be a predominately Indian community.
>
> (v) an officer of the court involved in the proceeding has knowledge that the child may be an Indian child.

A-2646-13T1

[<u>Guidelines for State Courts; Indian Child</u>
<u>Custody Proceedings</u>, 44 <u>Fed. Reg.</u> 67584,
67586 (Nov. 26, 1979).]

Only paragraph (i) is implicated in this case. Here, the mother reported during a compliance review hearing that ancestors on both her mother's and father's side of the family were part Native American. The mother provided the names of some of these ancestors. During the guardianship trial, K.T.D.'s mother testified she had an ancestor that was half Cherokee and that K.T.D.'s father had an ancestor that was "half Indian." K.T.D.'s mother also provided some identifying information about the descendants of these two ancestors. Given what K.T.D. and her mother reported to the court, there was sufficient reason to know or believe Ann might be an Indian child as defined under the ICWA. Even if there were any uncertainty, "'it is preferable to err on the side of giving notice.'" <u>In re Guardianship of J.O.</u>, 327 <u>N.J. Super.</u> 304, 315 (App. Div.) (quoting <u>Family Independence Agency v. Maynard</u> (<u>In re Maynard</u>), 592 <u>N.W.</u>2d 751, 757 (Mich. Ct. App. 1999)), <u>cert. denied</u>, 165 <u>N.J.</u> 492 (2000).

Accordingly, under 25 <u>C.F.R.</u> § 23.11, the Cherokee tribes and the BIA should have been notified of, among other things, the guardianship proceeding and the tribes' right to intervene.

To the extent of its knowledge, the Division was also obligated to provide those details about Ann's genealogy required in the regulation.

The Division argued that, because the mother failed to supply the information about Ann's genealogy[5] required in the regulation, the Division was relieved of its obligation to send any notices. We disagree. The regulation requires that such information be provided only to the extent it is known. Further, because the ICWA presumes that it is in an Indian child's best interests that he or she not be separated from family and tribal heritage, the mother's actions or inactions should not affect the protections afforded to Ann under the ICWA.

The Division also assumed that, in order to be a member of a tribe, one has to be formally enrolled or registered. However, not only is that incorrect but also Indian tribes have exclusive authority to determine who is a member of a tribe. Ordinance 59 Ass'n, supra, 163 F.3d at 1153 n.3. Further, because the information provided to the Family Part was not

---

[5] The regulation requires the following, if known, be provided: "all names known, and current and former addresses of the Indian child's biological mother, biological father, maternal and paternal grandparents and great grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers, and/or other identifying information." 25 C.F.R. § 23.11(d)(3).

sufficient to determine the identity of the tribe to which K.D.T.'s paternal ancestors may have belonged, the Division was required to send a notice to the BIA providing, among other things, "as much information as is known on the Indian child's direct lineal ancestors . . . ."  See 25 C.F.R. § 23.11(b). Once it receives an appropriate notice, the BIA must make reasonable efforts to locate and notify the appropriate tribe of the termination proceedings.

We are thus compelled to remand this matter so that the appropriate notices can be provided to the Cherokee tribes and the BIA in accordance with the ICWA and its implementing regulations.  See 25 U.S.C. § 1912(a); 25 C.F.R. § 23.11.  Although it is imperative that notice be provided at the earliest possible time to avoid undue disruption or delay of Guardianship proceedings, notice must be provided even at this late stage.

To minimize the delay in securing permanency and stability for Ann, the trial court shall ensure that the notices are sent forthwith.  The judgment terminating parental rights shall be deemed affirmed if after being served with the requisite notices under the ICWA: (1) no tribe responds to the notices within the time provided under the ICWA; (2) no tribe determines within the time allotted under the ICWA that Ann is an Indian child as

defined by the ICWA; or (3) the court determines, after the tribes have been given an opportunity to intervene, that the ICWA does not to apply to this matter. If Ann is determined to be an Indian child under the ICWA, the judgment terminating parental rights shall be vacated and the trial court shall hold further proceedings consistent with the ICWA. All proceedings shall be conducted as expeditiously as practicable in accordance with the overarching goal of attaining permanency for Ann.

Remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION