# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3588-23
A-3589-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.D. and J.D.,[1]

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.D.,
N.D., and J.D., minors.

_____

     Submitted February 23, 2026 – Remanded March 20, 2026.
     Resubmitted May 11, 2026 – Decided May 28, 2026

     Before Judges Natali and Walcott-Henderson.

---

[1] We use initials and pseudonyms to protect the privacy of the minor children and the parties included. R. 1:38-(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0034-23.

Jennifer N. Sellitti, Public Defender, attorney for appellant A.D. (Carol Widemon, Designated Counsel, on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant J.D. (Rebekah E. Heilman, Designated Counsel, on the briefs).

Jennifer Davenport, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the briefs).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the briefs).

PER CURIAM

In this consolidated appeal, defendants A.D. (Amy) and J.D. (Jim) appeal from a final judgment terminating their parental rights to their three children: A.D. (Ava), N.D. (Nia), and J.D. (Jon) and contend the Division of Child Protection and Permanency (Division) failed to prove each prong of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Law Guardian supports the termination of the defendants' parental rights on appeal as it did before the court. Defendants also appeal from a May 8, 2025 order that concluded the

2

Division satisfied the requirements of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901 to -1963, and the Interstate Compact for the Placement of Children (ICPC), N.J.S.A. 9:23–5.

Based on our review of the record and applicable law, we are satisfied that the evidence in favor of the guardianship petition overwhelmingly supports the court's decision to terminate defendants' parental rights. Accordingly, we affirm both orders substantially for the reasons set forth by Judge Scott J. Bennion, in his comprehensive June 27, 2024 and May 8, 2025 oral decisions and his thorough April 24, 2026 supplemental written decision provided in response to our February 26, 2026 and March 20, 2026 sua sponte remand orders, discussed more fully below.

I.

The guardianship petition was tried before Judge Bennion over the course of twenty-one non-consecutive days. The Division presented overwhelming evidence that established, by clear and convincing evidence, all four statutory prongs outlined in N.J.S.A. 30:4C-15.1(a). In his thorough oral decision, the judge concluded that termination of defendant's parental rights was in the children's best interests and fully explained the basis for each of his determinations.

A-3588-23

Judge Bennion based his factual findings on the extensive witness testimony and evidence presented by the parties. Specifically, the four Division witnesses: Tobiann Wilson and Francesca Locantore, two Division caseworkers who testified to their experiences with defendants, the children, and their efforts to assist the family over the course of several years; Dr. Alison Strasser Winston, Ph.D., a clinical psychologist, qualified as an expert in the field of clinical psychology, parental capacity, and bonding who testified regarding psychological evaluations of defendants in June 2022; and Stephanie Kurilla, a supervisor at the Center for Evaluation and Counseling, qualified as an expert in the field of forensic assessments who testified to her July 2023 forensic assessments of defendants.

In addition, the Law Guardian called two witnesses: Dr. Rachel Jewelewicz-Nelson, Psy.D., a psychologist, qualified as an expert in developmental psychology, parenting capacity, and bonding, who testified to her psychological evaluations of defendants and their bonding evaluations with the children in May and June 2023; and Laura, the licensed resource parent with whom the children have been placed since April 2021 and who testified as to her relationship with the children and defendants.

A-3588-23

Judge Bennion also considered testimony from defendants' witnesses including defendants themselves; Dr. Karen Wells, Psy.D., a licensed clinical psychologist, qualified as an expert in psychology and bonding who testified to her bonding evaluation of Jim with the children in August 2023; and Dr. Aida Ismael-Lennon, Psy.D., a certified school psychologist and qualified clinical psychologist who testified to her psychological and bonding evaluation of Amy.

Judge Bennion entered an order on June 27, 2024 which memorialized his decision to terminate defendants' parental rights. In his corresponding oral decision, he detailed the relevant and extensive procedural and factual history and found all of the witnesses to be "credible," with the notable exception of defendants for whom he made no specific credibility findings and Locantore, for whom the judge noted he "neglected to make credibility findings" but concluded "was believable."

He next addressed the four prongs of the best interest analysis under N.J.S.A. 30:4C-15.1 and made factual findings with respect to each prong. Beginning with the first, he found the Division demonstrated by clear and convincing evidence that the "children's safety, health, and development has been or will continue to be endangered by the parental relationship due to both parents' unremediated substance abuse, mental health, and domestic violence

concerns." He discussed relevant incidents involving the children's safety including an April 2021 incident where the children were taken to the hospital and Amy tested positive for multiple substances, Amy's week-long mental health hospitalization in July 2023, and Jim's physical abuse of the children, as corroborated by the children themselves. The judge found, in the three years since the end of the protective services litigation and beginning of the guardianship litigation, neither parent "has addressed the concerns raised by the Division or ordered by the [c]ourt," and both "have refused services to address their substance abuse, domestic violence, and mental health issues." He concluded the situation has "deteriorated to the point where the children . . . refused in-person visits," and found the children's three years in the foster care system to be a significant "cumulative[-]effect" harm and a "direct result of parents' refusal to address the issues."

With respect to the second prong, the parents' willingness or ability to eliminate the harm and provide a safe and stable home, Judge Bennion found "the evidence demonstrates that both parents are unable to eliminate the harms facing their children and that they are unable to provide them with a safe and stable home." He concluded the parties were in the "same exact place" since the Division was granted custody of the children in April 2021. He found the

6

parents "only completed parenting classes" despite the extensive services offered by the Division. He found the services were "necessary" based on the recommendations by multiple professionals and as required by several orders. The judge further found "the well-documented and continual history of domestic violence," Amy's refusal to comply with mental health treatment recommendations, and Jim's housing instability supported his decision. Finally, he found the children "deserve[d] permanency," as explained by Dr. Winston, Dr. Jewelewicz-Nelson, and Dr. Wells, a status they would not achieve with their parents.

As to the third prong, the judge found the Division proved by clear and convincing evidence that "it provided reasonable efforts, numerous reasonable efforts over three years to provide services to correct the circumstances . . . and alternatives to termination ha[d] been considered." He detailed the extensive resources caseworkers Wilson and Locantore attempted to provide, including: substance abuse assessments and treatments, urine screens, domestic violence services, virtual and in-person visitation resources, psychological and psychiatric evaluations, family team meetings, parenting classes, mental health treatment, individual counseling, housing, relative exploration, and counseling for the children. The judge expressly found that the Division considered and

ruled our various relatives, some at their own request. He also found the Division considered alternatives to termination, as both case workers testified they explained the differences between kinship legal guardian (KLG) and adoption to the resource parents. He also relied on the testimony of one of the resource parents, who explained she and her husband were not interested in KLG.

Finally, as to prong four, whether termination will do more harm than good, Judge Bennion found the children would "suffer [less] harm from termination of ties with the natural parents than where they are ultimately adopted." He based his opinion on the testimony of the four psychologists, none of whom recommended reunification with the parents. He also considered the psychological evaluations, bonding evaluations between the parents and children, and observations of the resource parents, all of which "was of the opinion that termination was appropriate and it would not do more harm than good."

Further, the judge concluded that the resource parents "can mitigate any harm the children may suffer if termination of parental rights is granted." He noted the resource parents "have a close relationship with the maternal grandparents and arrange for the children to have visits with the relatives, which

8

they plan on continuing post-adoption if it were to be granted." He found the resource parent's testimony revealed they "would be in favor of continuing contact between the children and their parents if the appropriate circumstances existed and it were clinically supported by the children's therapist."

Both parents appealed, and we issued an order remanding the matter to the trial court for "proper implementation of the requirements of the [ICWA]" and also instructed Judge Bennion to "address the [ICPC] issue, if warranted." The remand hearing occurred on May 8, 2025, during which the Department of Children and Families Office of Legal Affairs ICWA Liaison Susan Agos testified about her efforts to comply with the notification process. Agos testified to her extensive efforts, working alongside the Bureau of Indian Affairs (BIA), to notify all the relevant tribes and provide them with sufficient time beyond what the statute requires. She received multiple return receipts from all of the tribes, except the Alabama-Quassarte. She stated the United States Postal Service informed her the inquiry packet could not be delivered to the Alabama-Quassarte tribe, and she testified she attempted to contact the tribe via the phone number provided by the BIA, but it was not in service.

At the hearing, defendants first argued the ICPC did not apply to their children because of the familial proximity of Ada as Jim's daughter. They

A-3588-23

contended that because they had identified a daughter, the parents' support for placement was sufficient, and additional screening pursuant to the ICPC was unnecessary and not statutorily required. Second, they argued the Division did not make sufficient efforts to notify and contact relevant tribes with respect to the children's eligibility for tribal membership.

After hearing oral arguments and testimony, Judge Bennion ruled that pursuant to N.J.S.A. 9:23-5, the exceptions to the ICPC in Article VIII(a) "do not apply in cases where the Division has custody." Although Article VIII(a) of the ICPC states it is inapplicable with respect to "[t]he sending or bringing of a child into a receiving state" by certain close relatives, he distinguished this case from State, Div. of Youth & Fam. Servs. v. K.F., 353 N.J. Super. 623 (App. Div. 2002) and McComb v. Wambaugh, 934 F.2d 474 (3d Cir. 1991), where the Division already had custody of the children. Because the maternal grandparents refused placement and the Division already placed the children with the non-relative resource parents, the judge found the ICPC applied.

With respect to the ICWA, he concluded, pursuant 25 C.F.R. §§ 23.108 and 23.112, that "the Division has . . . satisfied the ICWA notice requirements" after contacting seventeen tribes but required the Division to notify the parents if "it is determined there is eligibility." Although the Division never received a

10

response from the Alabama-Quassarte tribe, he found, as Agos testified, the Division was required to obtain the tribe's contact information through the BIA. The judge also noted, despite being ordered to "provide information regarding their registration or membership," neither parent had provided such information. He also noted, over the course of the extensive litigation including the multi-week trial, "no one ever raised any issues . . . regarding these children having Native American heritage."

We issued additional remand orders on February 26, 2026 and March 20, 2026. Those orders directed Judge Bennion to make factual findings as to the suitability of Jim's adult daughter Ada's home in Oklahoma, irrespective of any obligations under the ICPC, and further directed the Division to contact the Alabama-Quassarte tribe at the address on its website pursuant to Jim's arguments. In accordance with our remand instructions, Judge Bennion held at least five proceedings throughout March and April 2026. He issued supplemental factual findings and legal conclusions and determined that placement in Ada's home would not have been in the children's best interests. As the judge explained, the Oklahoma authorities raised legitimate concerns about Ada's husband, who had a history of criminal charges including active warrants in Texas, demonstrating a "pattern of violence." And, he observed that

the children would suffer harm if removed from their long-time resource home. Further, he found based on additional testimony from Agos, that the Division contacted the Alabama-Quassarte tribe at an updated address and the tribe reported that the children were not eligible for membership.

Before us, Amy raises the following arguments:

POINT I

BECAUSE THE LOWER COURT'S DENIAL OF [AMY]'S REQUEST FOR AVA'S TESTIMONY RESTED ON THE HEARSAY OPINION OF A THERAPIST OF UNKNOWN QUALIFICATIONS WHO DID NOT TESTIFY, IN CONTRAVENTION OF ALY'S DUE PROCESS RIGHT TO CONFRONT WITNESSES, THIS COURT SHOULD REVIEW THIS MATTER DE NOVO, REVERSE THE DECISION BELOW, VACATE THE JUDGMENT OF GUARDIANSHIP AND RESTORE [AMY]'S PARENTAL RIGHTS.

POINT II

BECAUSE THE LOWER COURT'S BEST INTERESTS PRONG ONE HOLDING RELIED ON INCOMPETENT HEARSAY EVIDENCE, AND ITS CATEGORICAL FINDING THAT MARIJUANA USE ENDANGERS CHILDREN, THIS COURT SHOULD REVIEW THIS MATTER DE NOVO, REVERSE THE DECISION BELOW AND VACATE THE JUDGMENT OF GUARDIANSHIP.

A-3588-23

POINT III

DE NOVO REVIEW AND REVERSAL OF THE DECISION BELOW IS WARRANTED AS DCPP'S FAILURE TO FULLY ASSESS RELATIVES FOR THE CHILDREN'S PLACEMENT DEPRIVED THE COURT OF THE ABILITY TO ASSESS ALTERNATIVES TO TERMINATION UNDER PRONG THREE, AND ABSENT SUCH AN ASSESSMENT, THE LOWER COURT WAS REQUIRED BY LAW TO REVERT THIS MATTER TO A TITLE NINE CASE UNDER THE FN DOCKET.

POINT IV

BECAUSE THE COURT'S PRONG FOUR ANALYSIS FAILED TO CONSIDER DR. LENNON'S TESTIMONY REGARDING HARM TO THE CHILDREN FROM TERMINATION OF PARENTAL RIGHTS, THE RESULTING DECISION WAS SO WIDE OF THE MARK AS TO HAVE CAUSED AN INJUSTICE THEREBY REQUIRING THIS COURT TO REVERSE THE DECISION BELOW, VACATE THE JUDGMENT OF GUARDIANSHIP AND RESTORE [AMY]'S CONSTITUTIONAL RIGHT TO PARENT HER CHILDREN.

POINT V

BECAUSE THE LOWER COURT'S FINDING UNDER PRONG FOUR THAT POST-ADOPTION CONTACT BETWEEN THE CHILDREN AND THEIR MATERNAL GRANDPARENTS WOULD MITIGATE ANY HARM FROM TERMINATION OF PARENTAL RIGHTS IS CONTRARY TO THE LAW OF THIS STATE REGARDING POST-ADOPTION VISITATION, THIS COURT SHOULD REVIEW THIS MATTER DE NOVO, REVERSE THE

13

DECISION BELOW AND REINSTATE [AMY]'S PARENTAL RIGHTS.

POINT VI

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DETERMINED DCPP COMPLIED WITH THE REQUIREMENTS OF ICWA DESPITE ITS FAILURE TO CONTACT THE ALABAMA QUASSARTE TRIBE FOR A DETERMINATION OF WHETHER THE CHILDREN WERE INDIAN CHILDREN ENTITLED TO THE PROTECTIONS OF THE INDIAN CHILD WELFARE ACT (ICWA).

Separately, Jim contends:

POINT I

THE COURT'S PRONG 1 FINDING THAT JIM ENDANGERED HIS CHILDREN THROUGH UNREMEDIATED SUBSTANCE ABUSE, MENTAL HEALTH AND DOMESTIC VIOLENCE IS NOT SUPPORTED BY SUBSTANTIAL CREDIBLE EVIDENCE AND IS NOT ENTITLED TO DEFERENCE WARRANTING REVERSAL.

A.    The Court's Finding that Jim Endangered the Children Through His Substance Abuse Disorder Is Not Supported by Substantial Credible Evidence Warranting Reversal.

B.    The Court's Finding that Jim Endangered the Children Through Unremediated Mental Health and Domestic Violence Concerns Is Not Supported by Substantial Credible Evidence.

14

POINT II

THE COURT'S PRONG 2 FINDING THAT JIM WAS UNWILLING TO END THE CHILDREN'S OUT OF HOME PLACEMENT BECAUSE HE WAS UNABLE TO SECURE A SAFE HOME, REFUSED TO COMPLETE DRUG TREATMENT AND DID NOT PARTICIPATE IN DOMESTIC VIOLENCE SERVICES IS NOT SUPPORTED BY SUBSTANTIAL CREDIBLE EVIDENCE AND IS NOT ENTITLED TO DEFERENCE.

A.    The Court's Finding that Jim Was Unwilling to Secure Stable Housing is Not Supported by Substantial Credible Evidence that DCPP Failed to Exert Reasonable Efforts to Help Jim Secure Housing and Financial Assistance As Required by [the Adoption and Safe Families Act (ASFA)] and N.J.S.A. 30:4C-13.

B.    DCPP Failed to Exert Reasonable Efforts To Develop Separate Permanency Plans for Aly and Jim. DCPP and the Court Mandated and Encouraged That Were Not Suitable Based On Domestic Violence Concerns.

POINT III

THE COURT'S PRONG 3 FINDING THAT DCPP PROVIDED REASONABLE EFFORTS TO END THE CHILDREN'S PLACEMENT AND CONSIDERED ALTERNATIVES TO TERMINATION IS NOT SUPPORTED BY SUBSTANTIAL CREDIBLE EVIDENCE AND IS NOT ENTITLED TO DEFERENCE.

A.    In Finding Prong 3 Had Been Proven by Clear and Convincing Evidence the Court Erroneously Found

15

that DCPP Provided Reasonable Efforts to Facilitate Appropriate Visitation.

B. In Finding Prong 3 Was Proven by Clear and Convincing Evidence the Court Erroneously Held DCPP Met Its Obligation to Consider Alternatives to Termination But DCPP Did Not Sufficiently Consider Relative Placements and Kinship Legal Guardianship.

C. In Finding Prong 3 Had Been Satisfied The Court Did Not Analyze if DCPP Had Proven Beyond a Reasonable Doubt Compliance with ICWA, and DCPP Did Not Prove Beyond Reasonable Doubt, At Trial Or On Remand, That It Satisfied ICWA Notice Requirements.

POINT IV

THE COURT'S PRONG 4 FINDING THAT TERMINATION WOULD NOT DO MORE HARM THAN GOOD IS UNSUPPORTED AND IS NOT ENTITLED TO DEFERENCE AND WARRANTS REVERSAL.

In supplemental briefing invited following our 2026 remand, Amy argues that the remand court erred in finding that placement in Ada's home would not have been in the children's best interests because it failed to supplement the trial court record and improperly shifted the burden of proof to the parents to prove that Ada's home was suitable. She also argues, without specificity, that the Division failed to follow proper procedures and explore all possibilities for

16

relative placement.  Separately, Jim argues that the remand court should have entertained additional testimony about the suitability of Ada's home.

## II.

The limited nature of our review of a court's decision to terminate parental rights is well-settled.  N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012).  "A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings."  N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015) (citing F.M., 211 N.J. at 448).  Our Supreme Court has noted in respect to termination of parental rights cases, "a trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'"  N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

"We accord deference to fact findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family."  F.M., 211 N.J. at 448.  This enhanced deference is particularly appropriate where the court's findings are founded upon the credibility of the witnesses' testimony.

17

N.J. Div. of Youth & Fam. Servs. v. H.B., 375 N.J. Super. 148, 172 (App. Div. 2005) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). No deference is given to the trial court's "interpretation of the law," which we review de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

## III.

A parent has a constitutionally protected right "to enjoy a relationship with his or her child . . . ." In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

A-3588-23

When terminating parental rights, the court must consider the "best interests of the child . . . ." K.H.O., 161 N.J. at 347. A petition to terminate parental rights may be granted only if the following four prongs enumerated in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence:

> (1) the child's safety, health, or development has been or will continue to be endangered by the parental relationship; (2) the parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm; (3) the [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and (4) termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a)(1) to -(4).]

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "[T]he cornerstone of the inquiry [under N.J.S.A. 30:4C-15.1(a)] is not whether the biological parents are fit but whether they can cease causing their child harm." In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

The first prong of the best interests test requires the Division to show that "the alleged harm 'threatens the child's health and will likely have continuing deleterious effects on the child.'" Id. at 449 (quoting K.H.O., 161 N.J. at 352). "To satisfy this prong, [the Division] does not have to wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" Ibid. (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)).

A child's unfulfilled need for a permanent home is a harm in itself. N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 591–92 (App. Div. 1996). Likewise, a parent's failure to provide "solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379. Compounding the harm is the parent's "persistent failure to perform any parenting functions and to provide . . . support for [the child.]" Id. at 380. Such inaction "constitutes a parental harm to that child arising out of the parental relationship [that is] cognizable under N.J.S.A. 30:4C–15.1(a)(1) and (2)." Id. at 380-81.

"The second prong, in many ways, addresses considerations touched on in prong one." F.M., 211 N.J. at 451. The focus is on parental unfitness. K.H.O., 161 N.J. at 352; D.M.H., 161 N.J. at 378–79. In considering this prong, the court should determine whether it is reasonably foreseeable that the parent can

20

cease to inflict harm upon the child. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607 (1986). "Prong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with foster parents.'" F.M., 211 N.J. at 451 (quoting K.H.O., 161 N.J. at 363).

"The third prong requires an evaluation of whether [the Division] 'made reasonable efforts to provide services to help the parent' remedy the circumstances that led to removal of the children from the home." Id. at 452 (quoting N.J.S.A. 30:4C–15.1a(3)). As part of the inquiry, "the court must consider the alternatives to termination of parental rights and whether the Division acted reasonably." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 434–35 (App. Div. 2001). "The reasonableness of the Division's efforts depends on the facts in each case." Id. at 435.

Under this prong, when a child is removed from a parent's custody, the Division must attempt to find relatives with whom the child can be placed. N.J.S.A. 30:4C–12.1. Moreover, we have "previously acknowledged with approval 'the Division's policy to place children with relatives whenever possible.'" N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 579 (App. Div. 2011) (quoting N.J. Div. of Youth & Family Servs. v. M.F., 357

N.J. Super. 515, 527 (App. Div. 2003)). "[T]here is no presumption in favor of placement with relatives." Id. at 580. However, "N.J.S.A. 30:4C–12.1 . . . does not permit the Division to embark on a course set for termination of parental rights and adoption by a foster parent without at least first exploring available relative placements." Ibid.

The fourth prong seeks to determine whether "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C–15.1a(4). The fourth prong serves as a "'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453. "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with the parent." E.P., 196 N.J. at 108. The court must determine "whether . . . the child will suffer a greater harm from the termination of ties with [his or] her natural parents than from the permanent disruption of [his or] her relationship with [his or] her foster parents." K.H.O., 161 N.J. at 355.

Because harm to the child stemming from termination of parental rights is inevitable, "the fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological

ties." Ibid. Rather, the court's inquiry is one of comparative harm, for which the court must consider expert evaluations of the strength of the child's relationship to the biological parents and the foster parents. Ibid. Thus, "'[t]o satisfy the fourth prong, the [Division] should offer testimony of a well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007)). "Under this prong, an important consideration is [a] child's need for permanency. Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." Ibid. (internal citation omitted).

IV.

We first address those arguments, interspersed in the parties' merits briefs, that address their challenges to Judge Bennion's factual findings and legal conclusions related to the four prongs enumerated in N.J.S.A. 30:4C-15.1(a). Before us, Amy argues the judge's conclusions, under prong one, are "at variance with [his] own evidentiary rulings . . . but also relied upon the diagnoses and opinions of non-testifying medical professionals whose qualifications were

23

unknown." With respect to his findings regarding her mental health and substance abuse, Amy contends "no expert testified regarding the methods used and basis for the alleged diagnosis of schizoaffective disorder" and "a parent's status as a recreational marijuana user cannot suffice as the sole or primary reason to terminate that parent's rights," particularly in light of his findings that she had not consumed alcohol since December 2021 and cocaine since July 2022.

Under prong one, Jim also contends the judge's findings are contrary to the record. He argues there is no evidence of his substance abuse, and "[c]hildren cannot be endangered by what does not exist." Like Amy, he contends, if he was abusing cannabis, this is an insufficient basis to terminate his parental rights. Jim asserts he is "in recovery from an opioid disorder" as confirmed in the record. Similarly, he contends he did not "have a mental health issue that required remediation" nor did the record reveal any "domestic violence concerns."

Under prong two, Amy makes no arguments, seemingly accepting the judge's conclusions, but Jim contends his findings that "[Jim] could not secure a safe and stable home, denied having substance abuse issues, refused to complete drug treatment, and had not participated in domestic violence services"

are inadequately supported by the evidence. He contends the record reveals that the Division's efforts were "neither 'reasonable' nor an 'effort'" as required by N.J.S.A. 30:4C-11.1(b). He maintains the Division's caseworker regularly refused to provide referrals and financial assistance to support his efforts to fix his housing instability. He contends the Division also failed to make reasonable efforts for a permanency plan with respect to Amy.

Under prong three, Amy contends the Division failed "to fully assess relatives for placement" and specifically that the Division failed to consider Ada, despite the ICPC assessment revealing no charges against the daughter and no criminal convictions against her husband. She asserts the record is "devoid" of any discussion addressing "the fact that her husband and her husband's father had the same name, [and] to determine whether the charges, even if properly lodged against her husband, could be waived to allow the children to be placed in her home." In any event, Amy contends the Division failed to fulfill its "statutory duty to assess all three of Jim's adult children" and "unlawfully" filed its guardianship complaint.

With respect to prong three, Jim argues the Division failed to make reasonable efforts to "consider alternatives to termination (relative placements and KLG), assist the parent in readying a safe home and securing employment

and facilitate visits." Jim contends the Division is to blame for the "constant changes in programs, [which] caused gaps in visitation due to intake procedures and establishing new logistics routines" and generally "was not calculated to help Jim maintain his bond with his children." He maintains the resource parents' preference against KLG should not be a consideration and the Division failed to contact one adult daughter.

Finally, under prong four, Amy contends the judge failed to fully consider Dr. Ismael-Lennon's testimony regarding the harm to the children that would visit the children if her parental rights were terminated. Relying on Dr. Ismael-Lennon's testimony with respect to the bond between Amy and the children, Amy contends the judge improperly discounted the "traumatization and harm to the children that would result from termination of [her] parental rights, failing to conduct a proper more harm than good analysis." Amy maintains the judge's findings that harm would be mitigated because "the resource parents have a close relationship with the maternal grandparents" and the "resource parent testified she would be in favor of continuing contact between the children and their parents if the appropriate circumstances existed" is merely based on an "assumption."

26

Under prong four, Jim contends Dr. Wells' testimony contradicts the judge's findings because Dr. Wells testified to the "bewilderment, sadness, and confusion" the children will feel after termination. He contends the judge instead relied on the inconsistent reports from Drs. Winston and Jewelewicz-Nelson, who "were biased against Jim and his parenting style, specifically that he placed a family meal at the center of his visits, and for valuing obedience without acknowledging his age and cultural background."

We reject all of these arguments because we are convinced Judge Bennion's decision to terminate Amy and Jim's parental rights under the four prongs of N.J.S.A. 30:4C-15.1(a) is supported by the overwhelming, credible evidence in the record. As reflected in the testimony of the case workers and experts, the record is replete with numerous incidents to support Judge Bennion's factual findings with respect to the parents' substance abuse, mental health, and domestic violence issues. Not only reflected in the testimony, but the parents' destructive pattern of behavior is discussed extensively in the documentary evidence in the record. Further, the children themselves recounted in that documentary evidence numerous fights and substance abuse that occurred in their presence.

27

Despite these well-documented and chronic parenting deficiencies, the record further reveals the parents refused the services offered by the Division. And, in instances when they did accept services, they failed to comply with the requirements or failed to show commitment to those efforts. The evidence also demonstrates the parents undermined attempts to establish regular visits with the children due to their abusive and erratic behavior. This evidence includes the parents accusing the resource parents of "kidnapping" the children, showing up to the visits smelling like alcohol and marijuana, and lashing out at visitation counselors. As considered by the judge, these incidents culminated when the children began refusing to attend visitation sessions despite encouragement from the resource parents.

We wholly disagree with Amy's contention that her mental health issues were only corroborated by inadmissible hearsay. As the Law Guardian cogently explains, not only did Amy not properly object to any discussion of her schizoaffective disorder, but her mental health concerns as found by the judge went far beyond this diagnosis. The record consists of overwhelming evidence of Amy's general mental health issues, for which she routinely refused services or treatment, including a week-long hospitalization in July 2023. We further disagree with Jim's contention that the Division did not provide him with ample

28

support for housing. The record is replete with evidence that the Division and its case workers worked diligently to connect both parents with housing support throughout this litigation, which they both frequently refused. Like visitation, when the parents did accept services, those services were undermined by the parents' self-sabotaging behavior.

We further disagree with the parents' contentions on appeal and in supplemental briefing, that the Division did not make reasonable efforts, particularly with respect to relative placement. The Division made extensive efforts to reach out to family members, including Jim's adult children, even where Jim and Amy did not endorse such placement. The record further reflects that the Division contacted two of Jim's three adult children and sought to contact the third, who had already had a child removed from her care, without success.[2] When relatives either ruled themselves out as placement options or were ruled out by the Division, no appeals were filed. To the extent the parents contend the Division did not fully explore Jim's adult children, it is clear from the record that this was not the case. Rather, the Division acted appropriately,

---

[2] In his reply brief, Jim, for the first time before us, states that the children have seven adult siblings. The extensive record, however, reveals that Jim only identified the aforementioned three adults as potential placement options.

A-3588-23

and it was Jim who did not provide contact information or family members did not respond to the Division's inquiries.

We also disagree with the parents' arguments that the ICPC assessment with respect to Ada was inaccurate. As the Division explains, there is no evidence to support that the ICPC assessed the wrong person other than Jim's bald claim in a December 2024 certification that the identity of Ada's husband or her husband's father may have been confused. As indicated in the Division's correspondence on the ICPC assessment in Oklahoma and Judge Bennion considered, the assessment was based on information obtained from the FBI, and the husband further refused to comply and provide information. Further, the Division's rule-out assessment, issued several years ago, was never appealed.

Nonetheless, we are guided by the recent decision in <u>Division of Child Protection & Permanency v. T.B. and E.R.</u>, 262 N.J. 95 (2025), wherein our Supreme Court held that the ICPC "does not apply to matters concerning parents and other enumerated relatives." We thus emphasize that, on remand, Judge Bennion reasonably concluded that placement with Ada was not in the children's best interests, even irrespective of any obligations under the ICPC, particularly where her husband demonstrated a "pattern of violence." Thus, the home was not a suitable placement option even if the ICPC procedures had been required

here.  See also K.F., 353 N.J. Super. at 635.  We are unpersuaded by the parents' arguments in their supplemental briefing that urge error because Judge Bennion failed to take additional testimony at the remand hearings and argued he improperly shifted the burden of proof to them.  We note the February 26, 2026 remand order did not expressly call for additional testimony, and it is clear the judge was able to make the necessary findings based on the extensive record before him.

Finally, the parents' contentions that the Division did not explore other options besides termination of their parental rights is incorrect.  The documentary evidence, consistent with the resource parent and caseworker's testimony, revealed the Division explained thoroughly the options to avoid a termination remedy, but the resource parents did not want to pursue KLG.  Further, as the resource parent testified, the children maintain a close relationship with the maternal grandparents, and the resource parent, who the judge found credible, testified she would be open to visitation with the parents, depending on the circumstances and expert medical advice.

V.

Amy also contends the Division "failed to exercise reasonable efforts to determine the children's heritage" because of its failure to contact the Alabama-

Quassarte tribe. She argues this failure is so egregious in light of "Jim's December 1, 2024 Certification [that] made five different references to his family members' residence in Alabama, as well as his and his children's Quassarte [t]ribal heritage." Because of the certification, she argues, "in the present matter it is not the number of [t]ribes contacted by [the Division] that is worthy of note, but rather [its] lack of effort to contact the Alabama Quassarte, the [t]ribe most closely aligned with the information in Jim's Certification." Jim similarly asserts the Division "failed to prove beyond a reasonable doubt that it had complied with its statutorily mandated duty to notify tribes" because it failed to "correctly notify the Muscogee or the Alabama-Quassarte." He asserts the new address of the Alabama-Quassarte is readily available and "could have been used."

In response, the Division contends it complied with the ICWA notice requirements because the record demonstrates it "properly provided notice to the BIA . . . not once, but multiple times." It contends Jim's reference to the website is misplaced because, "as Agos testified, she was required to obtain the tribe's contact information through the BIA and could not have simply conducted a Google search." Similarly, the Law Guardian contends the Division's "attempts to provide all tribes with the family's information were reasonable in

32

light of the information it had." They argue the address referenced by Jim "is not an official location . . . as required by the [ICWA] for service of confidential documents." We disagree with both parents' arguments based on the judge's factual findings made in response to our remand order which are fully supported by Agos' testimony at the remand proceedings and the voluminous exhibits that supported that testimony. Following our recent remand, the Division affirmatively communicated with the Alabama-Quassarte tribe, and the tribe reported that the children were not eligible for membership.

The ICWA was enacted to preserve Native American families; it limits a court's ability to remove Native American children from their families. K.T.D., 439 N.J. Super. at 368-69. The ICWA applies only to children who are members of or eligible for membership in a federally recognized Indian tribe. 25 U.S.C. § 1903. In any termination of parental rights proceeding, if the court knows or has reason to know that a child may be Native American, then the child's tribe must be notified. K.T.D., 439 N.J. Super. at 369; 25 C.F.R. § 23.111(d)(3) (listing the information to be included in the notice). If the child's tribe cannot be identified, then notice must be provided to the Bureau of Indian Affairs (BIA) that a guardianship proceeding is pending. K.T.D., 439 N.J. Super. at 369; 25 U.S.C. § 1912(a); 25 C.F.R. § 23.111(b). The tribe has a right to intervene in a

termination proceeding if any child involved is a member of the tribe. K.T.D., 439 N.J. Super. at 369-70. The purpose of the notice requirement is to provide the tribe with the opportunity to determine if the child in question is an "Indian child" as defined by ICWA. Ibid.

Under federal regulations, the Division, as the "party seeking" termination, was obligated, if known, to "directly notify the parents . . . and the child's Tribe by certified mail with return receipt requested, of the pending child-custody proceedings and of their right of intervention." 25 C.F.R. § 23.11(a). The Bureau of Indian Affairs (BIA) "has issued guidelines to assist in interpreting the ICWA." K.T.D., 439 N.J. Super. at 371. Per the Guidelines, "[i]f there is reason to know the child is an Indian child, but the court does not have sufficient evidence to determine that the child is or is not an 'Indian child,'" the court must, among other responsibilities, "[t]reat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an 'Indian child.'" 25 C.F.R. § 23.107. The Guidelines clarify that a court must also confirm that the Division made "active efforts" to work with the tribes to verify if the child may be eligible for membership. 25 C.F.R. § 23.120. The Guidelines define "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with

34

his or her family." 25 C.F.R. § 23.2. Once a child is determined to be an Indian child, proof beyond a reasonable doubt is required. K.T.D., 439 N.J. Super. at 370 (citing 25 U.S.C. § 1912(f)).

We are convinced the record reflects the Division satisfied its requirements to work with the BIA and notify tribes with respect to the children's potential eligibility for tribe membership. As Agos testified, the Division contacted seventeen tribes and attempted to notify the Alabama-Quassarte tribe three separate times. As the judge concluded, based on Agos' testimony, the Division is required, by federal code, to work with the BIA in notifying tribes. The judge's conclusion is further supported in light of the parents' failure to turn over information regarding their heritage and background, despite court orders. The record reflects that when the parents did turn over information, like the names of Jim's family members, the Division updated its inquiries with the BIA and corresponding notifications.

For completeness, our recent remand order directed the Division to contact the Alabama-Quassarte tribe at the address listed on its website, consistent with Jim's arguments. As Agos recently testified, that contact resulted in the tribe concluding that the children were not eligible for membership.

## VI.

Finally, we reject Amy's argument that the judge's August 29, 2023 and April 25, 2024 rulings that precluded her from "call[ing] Ava to testify or be interviewed by the court in camera with her Law Guardian" violated her confrontation rights "guaranteed by due process in civil matters." She specifically maintains Judge Bennion erred because there was a "need for clarification from Ava's own words" because the testimony of Drs. Winston and Jewelewicz-Nelson "elicited confusing and contradictory statements from Ava about where she wanted to live." She further contends Ava was required to testify because the children were "never informed about the meaning and consequences of adoption, as both Drs. Winston and Jewelewicz-Nelson conceded they did not discuss adoption with the children."

Further, she argues the trial court's decision was "not based on competent evidence . . . such as those contained in the therapist's letter" but "inadmissible hearsay absent testimony from the mental health professional who performed the evaluation." She argues the "therapist's letter" should have been excluded under N.J.R.E. 808 because the judge "had no information . . . regarding the education, training, or experience of the therapist . . . ." Because Ava's testimony was excluded based on this hearsay, Amy argues the judge "deprived

36

[him]self of information regarding Ava's wishes regarding reunification with her parents."

"[P]arental rights are fundamental and constitutionally protected . . . [and] the court's authority to remove children from the custody of their parents must be exercised with scrupulous adherence to procedural safeguards." N.J. Div. of Youth & Fam. Servs. v. A.R.G., 179 N.J. 264, 286 (2004) (citations omitted). "It is well established as a matter of due process principle that procedural requirements are more demanding in parental termination cases than in ordinary civil actions, including other types of cases dealing with parental rights." Div. of Youth & Fam. Servs. v. M.Y.J.P., 360 N.J. Super. 426, 467 (App. Div. 2003) (citations omitted). Adequate notice and a meaningful opportunity to be heard are the cornerstones of due process. A.R.G., 179 N.J. at 286 (citations omitted). However, in termination proceedings, "[t]he requirements of due process do not confer a constitutional right of confrontation . . . ." M.Y.J.P., 360 N.J. Super. at 467.

We note that although "due process guarantees civil litigants a measure of confrontation[,]" it is also a matter of public policy "to prevent further victimization or traumatization of young children called to testify in court proceedings." N.J. Div. of Child Prot. & Permanency v. C.W., 435 N.J. Super.

A-3588-23

130, 142 (App. Div. 2014) (quoting A.B. v. Y.Z., 184 N.J. 599, 604 (2005)). Rule 5:12-4(b) provides in pertinent part that, "[i]n the child's best interests, the court may order that a child not be present at a hearing or trial unless the child's testimony is necessary for the determination of the matter." The Rule further provides that, "[t]he testimony of a child may, in the court's discretion, be taken privately in chambers or under such protective orders as the court may provide." Ibid.

Separately, a "trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion." State v. Nantambu, 221 N.J. 390, 402 (2015) (quoting State v. Harris, 209 N.J. 431, 439 (2012)). Hearsay is simply an out-of-court statement offered for the truth of the matter it asserts. State v. Gore, 205 N.J. 363, 375 (2011) ("Our hearsay rules of evidence clearly provide that 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" (citation omitted)). N.J.R.E. 802 makes hearsay inadmissible, subject to exceptions as outlined in N.J.R.E. 803 and 804. A trial court's evidentiary rulings, such as whether the proponent of evidence has established that an item falls within the range of a hearsay exception, will be affirmed unless it was an abuse of discretion. Nantambu, 221 N.J. at 402.

We are convinced the court did not abuse its discretion when it denied Amy's request for Ava to testify, nor did it abuse its discretion when it relied on the therapist's letter to reach its conclusion. As explained in that letter, requiring the child to testify would cause her significant emotional harm, even if she testified in chambers. This conclusion is consistent with the opinions of Dr. Ismael-Lennon and Dr. Wells, which the court also considered. We are satisfied the court also relied upon Ava's wishes to remain with the resource parents, as later articulated to the Law Guardian and Dr. Jewelewicz-Nelson. In any event, as the judge explained, Ava's wishes with respect to her placement were not dispositive, especially in light of the overwhelming evidence against reunification with the parents.

To the extent we have not addressed any of the parents' remaining arguments, it is because we conclude those arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3588-23